16589

STATE v. HIGHTOWER

(69 S. E. (2d) 363)

*Messrs. Edwin H. Cooper,* of Columbia, *and B. E. Nicholson,* of Edgefield, *for Appellant,* cite:

*Mr. Jeff D. Griffith, Solicitor,* of Saluda, *for Respondent,* cites:

*Messrs. Edwin H. Cooper,* of Columbia, and *B. E. Nicholson,* of Edgefield, *for Appellant, in Reply.*

February 6, 1952.

FISHBURNE, Justice.

The appellant was tried and convicted at the March Term of the Court of General Sessions for Edgefield County, upon an indictment charging him and "other persons unknown" with conspiracy to cheat and defraud the State of South Carolina, by unlawfully obtaining and selling information concerning a teacher examination given by the Department of Education on February 19, 1949.

The first two questions presented by the appeal relate to the indictment. It is charged that the trial court erred in refusing to quash the indictment upon the grounds, (1) that its allegations were too vague and indefinite to fully apprise appellant of the crime for which he was being tried; and (2) that the indictment was defective in that it failed to name any person or coconspirator with whom the defendant was alleged to have conspired.

The indictment charges: "That Willar Howard Hightower and other persons unknown, late of the county and state aforesaid, on the 18th day of February in the year of our Lord one thousand nine hundred and forty nine * * * at Edgefield Court House in the County and State aforesaid did unlawfully, feloniously and wilfully agree, confederate, conspire and band themselves together with the wilful, unlawful and felonious intent and purpose of cheating and defrauding the State of South Carolina and the taxpayers thereof of the sum of One Hundred ($100.00) Dollars or more, in that they, the said Willar Howard Hightower and other persons unknown, together with numerous other persons, conspired to and did obtain and purchase answers

to the National Teacher Examination to be given by a department of the State of South Carolina on February 19, 1949, which examination was given to those teaching and desiring to teach in the State of South Carolina for the purpose of establishing, in part, the amount of salary to be paid to such teachers and would-be teachers, and did in furtherance of said conspiracy and unlawful confederation, sell to Minerva Dow and to numerous others about to take said National Teacher Examination the answers to questions contained in the National Teacher Examination, which sales were made prior to said examination, all with the intent and purpose of aiding, abetting, assisting and causing said Minerva Dow and numerous other teachers and would-be teachers to obtain ratings to which they were not entitled and for which they were not qualified, thus aiding, assisting and abetting said Minerva Dow and numerous other teachers and would-be teachers to obtain money from the State of South Carolina to which they would not be entitled by reason of their own personal qualifications and capabilities, against the form of the Statute in such case made and provided, and against the peace and dignity of the State."

A reading of the indictment dispels any doubt or question that it contains a sufficient statement of the facts relied on as constituting the offense in ordinary and concise language, and in such specific terms as to enable the accused to be fully informed of the nature of the crime with which he was charged. Nor can there be any doubt that the charge is stated with such precision that the accused could plead his acquittal or conviction to any subsequent indictment based on the same facts.

Nor was it necessary that the indictment name any person or coconspirator with whom the defendant was alleged to have conspired.

In *State v. Ameker,* 73 S. C. 330, 53 S. E. 484, 487, the court approved the following definition of conspiracy as, "The combination of two or more persons

to do something unlawful, either as a means or as an ultimate end". And in *State v. Davis,* 88 S. C. 229, 70 S. E. 811, 812, 34 L. R. A., N. S., 295, it is stated: "Conspiracy, therefore, is rather described than defined, and the description which seems to have the widest recognition and approval by the authorities declare a criminal conspiracy to consist of a combination between two or more persons for the purpose of accomplishing a criminal or unlawful object, or an object neither criminal nor unlawful by criminal or unlawful means."

While two or more persons must combine to constitute a conspiracy, the weight of authority is against the contention of appellant that it is essential that one or more coconspirators must be named in the indictment. The question here presented has been definitely answered against the appellant in many cases which hold that the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown. *Rogers v. United States,* 340 U. S. 367, 71 S. Ct. 438, 95 L. Ed. 344, 19 A. L. R. (2d) 378; *State v. Davenport,* 227 N. C. 475, 42 S. E. (2d) 686; *People v. MacMullen,* 134 Cal. App. 81, 24 P. (2d) 794; 11 Am. Jur. Sec. 27, Page 561, 562; 15 C. J. S., Conspiracy, § 37, p. 1060; § 82, p. 1115.

An analogous case in our reports is *State v. Sauls,* 70 S. C. 393, 50 S. E. 17, 18. In that case the court stated: "While it requires the combined action of at least three persons to constitute the crime of riot, it has never been doubted that one of such persons may be indicted separately; the indictment stating the names of the others, or alleging them to be unknown."

Prosecution for the crime of conspiracy was involved in *State v. Jackson,* 7 S. C. 283, 24 Am. Rep. 476, which is relied upon by appellant. It was therein stated that, "The term 'conspiracy,' according to the books, implies a combination between two or more to do either an unlawful act or to

accomplish by unlawful means a legal end. The concurring will of at least two persons is as necessary to the offense as that of three to the constitution of a riot. * * * If all the defendants charged in an indictment for conspiracy are acquitted but one, *unless the offense is alleged to have been committed with others unknown,* from the very nature of the execution the verdict against that one could not be permitted to stand." (Emphasis added.)

A reading and consideration of the *Jackson case* does not support appellant's position that where one is charged in an indictment with conspiracy, the coconspirator must be named. And see *State v. Brazil,* Rice 257, 24 S. C. L. 257.

Error is assigned because the trial court overruled appellant's motion for a directed verdict of not guilty, made on the ground that the State had failed to produce sufficient evidence to prove that the alleged conspiracy was entered into in Edgefield County as charged in the indictment. Therefore, it is argued, the court lacked jurisdiction to try the case in that county.

An examination of the indictment and a consideration of the evidence offered at the trial will, in our opinion. disclose that the exceptions raising this issue are without merit.

The teacher, Minerva Dow, named in the indictment, testified, without contradiction, that she personally met the appellant in the town of Edgefield about two weeks prior to the day of the examination and arranged to obtain from him the "Key" of answers to questions to be given on the examination; and that by agreement then made, she later went to his home in Aiken County the night before the examination, —that is, on February 18, 1949—and obtained this key from him, for which she paid him $10.00.

It was not necessary for the State to prove that the alleged conspiracy was entered into in Edgefield County. The rule is generally recognized that if the overt act is committed within the court's jurisdiction, the

place of the conspiracy is immaterial. 15 C. J. S., Conspiracy, § 43, p. 1070.

It was held in *State v. McAdams,* 167 S. C. 405, 166 S. E. 405, that it is proper to allege both conspiracy and overt acts in an indictment so as to enable the State to prosecute in the county where such overt acts are committed. It was held in that case that the venue in an indictment for conspiracy may be laid in the county in which the agreement was entered into, or in any county in which an overt act was done · by any of the conspirators in furtherance of their common design. For example, if the conspiracy be formed at sea, the venue may be laid in any county in which an overt act was committed by one of the conspirators on land. *People v. Mather,* 4 Wend., N. Y., 299, 21 Am. Dec. 122. The fact that the operations take place in various states, as the necessities of the conspirators may require, does not affect the jurisdiction of the state in which any or all of them reside, since "otherwise the offense would be committed with impunity." *Bloomer v. State,* 48 Md. 521. And see Annotation, 3 Am. St. Rep. 473, 482.

In *State v. Quick,* 199 S. C. 256, 19 S. E. (2d) 101, 102, the general rule was stated that the law does not concern itself with mere guilty intention unconnected with any overt act; that no definite rule as to what constitutes an overt act can safely be shown, each case being dependent on its own particular facts. The court further said: "It is well settled that the 'act' is to be liberally construed, and in numerous cases it is said to be sufficient that the act go far enough toward accomplishment of the crime to amount to the commencement of its consummation."

To the same effect are *State v. Jackson,* 210 S. C. 214, 42 S. E. (2d) 230, and *State v. Reaves,* 203 S. C. 501, 28 S. E. (2d) 91; 22 C. J. S., Criminal Law, § 75, pp. 140, 141.

We think there can be no doubt that the evidence strongly tends to show not only an intention on the part of appellant to engage in the conspiracy, but that he was clearly engaged

in one of the initial steps involved in the conspiracy, and in furtherance of the common design, when he agreed to furnish the key to Minerva Dow.

As stated in 15 C. J. S., Conspiracy, § 83, p. 1116, "Where overt acts have been committed in furtherance of the conspiracy, the conspiracy is renewed as to all the conspirators at the place where the overt act is done, and it is not then necessary to allege the exact place where the conspiracy was originally formed."

It is clear, therefore, that the Court committed no error in holding the trial of this case in Edgefield County.

It is next contended that there is no relevant competent evidence to support the jury's verdict of conviction, and the trial judge therefore erred in overruling the defendant's motion for a directed verdict of not guilty. This question raises the issue as to the sufficiency of the proof of the conspiracy alleged in the indictment, which must be viewed in the light most favorable to the prosecution. Appellant argues that the conspiracy cannot be inferred alone from the commission of the alleged overt act. But the evidence in this case goes much further than proof of the overt act.

The overt act, which in this case was the agreement in Edgefield County, to sell Minerva Dow, a colored teacher, the "Key" answers to the questions to be given on the examination held on February 19, 1949, was subsequent to the conspiracy, and although the common law offense of conspiracy is complete when proved, overt acts may nevertheless be shown, since from them an inference may be drawn as to the existence and object of the conspiracy. It sometimes happens that the conspiracy can be proved in no other way. 15 C. J. S., Conspiracy, § 92, p. 1145.

A reading of the record convinces us that there was ample evidence which warranted the trial judge in submitting this

case to the jury on the question of conspiracy. The testimony shows a conspiracy on a large scale, in fact it was statewide, —in which the appellant and others combined to commit an unlawful act. They joined for the purpose of obtaining in advance of the teacher examination, information that would aid and assist those who were about to take the examination, in securing higher grades,—the purpose being to qualify for a salary in a higher bracket, and thus defraud the State. The evidence strongly tends to prove that this was done, and that appellant, Hightower, was a party to the crime.

The witness, Dr. Ellison M. Smith, Director of Teacher Education and Certification for the State Department of Education, testified how the fraud was perpetrated. It appears that no teacher can receive a certificate to teach in South Carolina without taking the National Teacher Examination, which is prepared by an agency in Princeton, New Jersey. This examination is given through the State Department of Education by Professor W. C. McCall, of the University of South Carolina. Examinations are held in various centers of the state, for white teachers and Negro teachers,—in Columbia, in Greenville, in Orangeburg and other centers.

Professor McCall administers the examination through local examiners for these centers who are trained in giving examinations. These local examiners in turn select room examiners and proctors to assist them. The examination given is what is called "A Multiple Choice Examination," which contains different subjects. Item 1, for instance, would be a question, and then under that would be five numbered probable answers, one of which would be the correct answer. On a separate sheet the various items or questions and these five probable answers appeared for the persons taking the examination to check. On the answer sheet, the person taking the examination would simply check or blacken with an electrographic pencil the answer she thought correct.

The examination with which we are concerned was held in Orangeburg and Minerva Dow went there to stand it, on February 19, 1949, having in her possession the key which she had purchased from appellant, and which he had cautioned her to use secretly so as to escape detection. As a result of the examination and by the use of the key, she obtained a higher grade and became entitled to a higher salary.

According to Dr. Smith, between 800 and 900 teachers who stood this examination in the various centers of the state, lost their certificates as teachers because of their participation in the conspiracy. The certificates were revoked because the teachers showed by their checked answers to the questions that they had used the key obtained as a result of the general conspiracy.

It appears further from the evidence of Dr. Smith that the Agency in New Jersey, which is referred to as the Educational Testing Service, prepared the examination questions or booklets, and all other material, and sent these down to the State Department of Education in Columbia. This material would usually arrive about a week prior to the examination,—in this case, a week prior to Saturday, February 19, 1949. It was received by Professor McCall and locked up by him until about two or three days before the examination, when he would call in his local examiners from the various centers and deliver the examination booklets and other material to them. These local examiners were charged to take this material to their homes, lock it up, and open it only on the morning of the examination, in the examination room. Thus, in this case, the examination questions were in the custody and control of the various local examiners over the State from Wednesday until Saturday, which latter day was the day on which the examination was held. It may reasonably be inferred from the evidence that the "keys" were never in possession of the local examiners or proctors prior to the examination.

During or following the examination quite a number of these keys were taken from teachers standing the examination and turned over by the local examiners or proctors to the State Department of Education; these keys had admittedly been used by the teachers. Upon receipt of the keys a thorough investigation was instituted by the Department of Education and hearings were held, as a result of which hundreds of teachers were disqualified, and their certificates revoked. Many of them confessed their participation in the use of the keys obtained as a result of the conspiracy.

The record shows that the State Department of Education had nothing to do with preparing the examination, checking it, or evaluating the answers; that was all done by the Educational Testing Service in Princeton, New Jersey.

Adverting now to the proof offered by the State, connecting the appellant with the crime charged: Not only do we have the testimony of Minerva Dow, which as stated was uncontradicted, but various other colored teachers were offered by the State as witnesses. Celestine Cave White, who lived in Aiken County where appellant resides, testified that he came to her home about 10 o'clock on the night of February 18, 1949, preceding the examination to be held the next day in Orangeburg, and attempted to sell to her for the sum of $50.00 one of the keys containing the correct answers to the examination to be given. She stated that she refused to buy at that time, and that he returned again about eleven o'clock. She again refused to buy, but upon her request he gave her several numbers from the key which she desired to check for correctness with a similar sheet she was obtaining from another source.

Still later that night, the principal of the colored school at which she taught,—Professor Robert Dean—came to Celestine White's home, where several other teachers had congregated, bringing with him a similar key. The key numbers were compared and found to be similar. The witness, Celestine White, used the key obtained from Dean, took the

examination in Orangeburg, and she likewise by the use of it obtained a higher grade and qualified for a higher salary.

Just prior to the investigation held by the Department of Education in Aiken, following these examinations, at which Celestine White was to appear as a witness, she sent word to appellant that he had better get in touch with her. He came the same night to see her, and she told him of the pending investigation. He told her that he was going to disclaim going to her home on the night of February 18th, when he attempted to sell her one of the keys to the examination.

Robert Dean testified that he had known appellant since 1932; that he met him approximately two weeks prior to the examination in question, at a basketball game at a colored school in Aiken County, and they discussed the approaching teacher examination. Appellant inquired if Dean intended to take it. Dean replied in the negative, but both he and appellant did take the examination when held in Orangeburg on February 19, 1949. According to Dean, some of the teachers had asked him to obtain keys for them. Appellant told Dean that he would be able to obtain and deliver the keys to him Wednesday night before the following Saturday, when the examination was to be held; his terms of sale were a minimum of eight teachers, each paying $50.00 for the keys. Dean refused to deal on this basis, and secured the keys from another source. Dean was at the home of Celestine Cave White on the night before the examination, where he saw the appellant, but had no further conversation with him. There is no denial in the record of this testimony, or that of Celestine Cave White.

A letter was introduced in evidence over the objection of appellant, purportedly written by him to Dean, which was handed to Dean subsequent to the conversation at the basketball game, just prior to the examination. It was signed on the typewriter, "WHH," which are the initials of appellant, was dated at Augusta, Georgia, on February 16, 1949, three

days prior to the examination which was held on February 19, 1949; and reads as follows:

"Dear Proff. Dean:

"This is to say that I shall expect you on the 18th which is Friday at 6:30. The things will not be ready until the 18th. I received a letter Monday.

"Yours truly,
"WHH."

This letter was in an envelope addressed to "Proff. Dean, Prin. of Pleasant Hill School." At the upper left hand corner of the envelope were the words, "After five days, return to W. H. Hightower."

All parts of this letter were typewritten; so was the return card.

The foregoing letter, if admissible, and we think it was for the reasons hereinafter stated, further tended to establish the guilt of Hightower in the conspiracy. It may reasonably be inferred that "the things" mentioned in the letter referred to the examination keys which he intended to sell to the teachers standing the examination, and which he had discussed with Dean at the basketball game.

The generally recognized rule is that the fact of a conspiracy may be proved by any relevant competent evidence, having a legitimate tendency to support the accusation. The conspiracy may be shown, of course, not only by direct evidence, but by circumstantial evidence, or by both. And in a case of this kind, in the reception of circumstantial evidence, great latitude must be allowed. *State v. Shipman,* 202 N. C. 518, 163 S. E. 657; 15 C. J. S., Conspiracy, § 92b, p. 1141. Here, we have not only circumstantial evidence, but direct evidence going to prove appellant's guilt.

Conspiracies may and generally must be proved by a number of indefinite circumstances which vary according to the objects to be accomplished. Any cir-

cumstance or act standing alone might have little weight, but, taken collectively, they point unerringly to the existence of the conspiracy. *Bloomer v. State,* 48 Md. 521. And as stated by the Court in *State v. Anderson,* 208 N. C. 771, 182 S. E. 643, 652: "When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose." And see Annotation, Vol. 3 Am. St. Rep., Page 482.

So, in the instant case, the inference may reasonably be drawn from the direct and circumstantial evidence that the appellant entered into the conspiracy alleged, with certain persons unknown, to defraud the State of South Carolina; and there was no error in submitting the issue to the jury.

It is argued that the trial judge erred in admitting the typewritten letter above referred to, signed with the typewritten initials "WHH," and addressed to Professor Dean, in that there was no proof of the authenticity of the typed initials.

We think there is sufficient proof of the authenticity of the letter and of the identity of the writer of that letter to warrant its admission in evidence. Like any other material fact, the genuineness of a letter may be established by circumstantial evidence if its tenor, subject-matter, and the parties between whom it purports to have passed make it fairly fit into an approved course of conduct, and manifests the probability that the subject-matter of its contents was known only to the apparent writer and the person to whom it was written,—these circumstances justify its admission. *Singleton v. Bremar,* Harp. L. 201, 16 S. C. L. 201; 20 Am. Jur., Sec. 955, Page 805; Annotation, 9 A. L. R. 984; *Hedgepeth v. Coleman,* 183 N. C. 309, 111 S. E. 517, 24 A. L. R. 232. The facts in this case differentiate it from *Williams v. Milling-Nelson Motors,* 209 S. C. 407, 40 S. E. (2d) 633.

In our opinion, the character of the letter in question, as shown by the evidence, leaves no doubt that the issue of its actual authorship was properly submitted to the jury. In this case, the appellant did not choose to take the stand, and did not testify, so that the record does not contain any specific denial from him as to the authenticity of this letter. Dean testified that the letter concerned the matter he had discussed with appellant, Hightower, and he knew no one else with the initials "WHH." Its tenor and subject matter were known only to Dean and appellant.

Finally, it is argued that the lower court erred in admitting in evidence, over objection, seven envelopes and their contents, which purportedly were keys to the examination.

While the State's witness, Dr. Ellison M. Smith, was testifying upon direct examination the State offered in evidence the seven envelopes and their contents. These related to the statewide examinations held in the various centers on February 19, 1949, in connection with which the alleged conspiracy arose.

The keys taken from various teachers during the examination and turned over to the State Department of Education were not confined to any particular locality, but were recovered from the teachers at various centers where examinations were held. Dr. Smith identified the keys and stated that they were all identical.

As heretofore stated, in the reception of circumstantial evidence in conspiracy cases great latitude must be allowed. The jury should have before them, and are entitled to consider, every fact which has a bearing on and a tendency to prove the ultimate fact in issue, and which will enable them to come to a satisfactory conclusion. The State has a right to show the whole history of the conspiracy, from its commencement to its conclusion. *Fairfield v. State,* 155 Ga. 660, 118 S. E. 395; *State v. Benson,* Mo. Sup., 8 S. W. (2d) 49.

The inference may reasonably be drawn from the whole record that appellant obtained the keys to the examination by conspiring with persons unknown.

Appellant, a colored man, had been a prominent teacher in the public schools of this state for years, was well known, and it may be inferred that he had many contacts, making it possible for him to commit the crime with which he is charged.

In our opinion, no error was committed in receiving the seven envelopes and their contents in evidence.

Judgment affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.