16636

STATE v. McINTIRE *ET AL.*
(71 S. E. (2d) 410)

506

*Messrs. James P. Mozingo III, of Darlington,* and *A. Frank Lever, Jr.,* of Lexington, *for Appellant,* cite:

*Messrs. T. C. Callison, Attorney General, William A. Dallis, Ass't. Attorney General,* and *T. Pou Taylor, Solicitor,* all of Columbia. *For Respondent,* cite:

508

June 10, 1952.

FISHBURNE, Justice.

The grand jury of Richland County jointly indicted the appellant, Harry Goff, and twenty-one codefendants, charging in the first count that they did on September 28, 1950, "at Lexington County Court House and Richland County Court House * * * wilfully and unlawfully * * * conspire together to publicly and privately erect, set up and expose to be played, a certain lottery * * * wherein and whereby the use of certain numbers, figures, tickets or chances were to be had and offered to certain persons unknown, wherein and whereby for the payment of certain sums of money, differing in amounts, the holder of said numbers * * * were to participate in a lottery * * * commonly known as the 'numbers game,' whereby said sums of money to be paid were to be ventured for the chances of obtaining larger sums in money."

In the second count, the indictment alleges in practically the same words as contained in the first count, wherein the conspiracy is charged, that the various defendants in furtherance of the common design did actually erect, set up and expose to be played a certain lottery· commonly known as the "Numbers Game," in the County of Richland.

Upon trial of the case, all of the defendants whose cases were submitted to the jury were convicted. The present appellant, Goff, is the only one who has appealed from the verdict and judgment of the court.

The first ground of appeal assigns error to the trial court in refusing to grant appellant's motion to quash the indictment upon the ground that the indictment did not contain

a sufficient statement of facts in plain and concise language so as to inform him of the charge and to enable him to prepare an adequate defense thereto. In our opinion, there is no merit in this contention.

The necessary elements in an indictment are set forth in Section 1003 of the Code of 1942. It is therein stated that every indictment shall be deemed and judged sufficient and good in law which in addition to allegations as to time and place, as now required by law, charges the crime substantially in the language of the common law or of the statute prohibiting the same, or so plainly that the nature of the offense charged may be easily understood.

The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the necessary elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet.

The general rule on this question is that the offense must be so described that the accused may know how to answer the charge, the court what judgment to pronounce, and conviction or acquittal thereon may be pleaded in bar to any subsequent prosecution. *State v. Wells,* 162 S. C. 509, 161 S. E. 177.

As stated in 15 C. J. S., Conspiracy, § 80, page 1112, "It is not necessary to detail the evidence of the conspiracy in the indictment, nor to recite the facts connecting all of the accused with one another in the web of the conspiracy, nor to describe the conspiracy with the same degree of particularity required in describing a substantive offense. * * *"

In our opinion, the wording of the indictment is not ambiguous or inconsistent as argued by appellant.

The facts alleged show that the offense was committed within the jurisdiction of the court—that is, in Richland County, where the case was tried.

As shown in *State v. Fisher,* 206 S. C. 220, 33 S. E. (2d) 495, 496, "The twofold purpose of the statute in requiring the indictment to allege the 'place' of the commission of the crime is to lay jurisdiction of the court, and inform the accused of the county in which he is charged with the violation of the law." The indictment in this case fully complies with the requirements of the law. To the same effect see *State v. Colclough,* 31 S. C. 156, 9 S. E. 811; *State v. Burbage,* 51 S. C. 284, 28 S. E. 937; *State v. Cole,* 107 S. C. 285, 92 S. E. 624.

The rule is further clarified in cases involving the criminal charge of conspiracy in *State v. Hightower,* S. C., 69 S. E. (2d) 363, where the court quoted from 15 C. J. S., Conspiracy, § 83, page 1116: " 'Where overt acts have been committed in furtherance of the conspiracy, the conspiracy is renewed as to all the conspirators at the place where the overt act is done, and it is not then necessary to allege the exact place where the conspiracy was originally formed.' "

Similar attacks were made upon the sufficiency of the indictment in the *Hightower case supra,* and the more recent case of *State v. Ferguson,* S. C., 70 S. E. (2d) 355.

As stated, we think that the indictment in this case fully complied with the applicable law and with our decisions construing the same.

The next question presented is closely related to the one which we have just discussed. It is argued that the court erred in holding that the General Sessions Court of Richland County had jurisdiction of the case, the error being that there was a total failure and lack of evidence against the appellant as charged in the indictment so as to give jurisdiction to the Richland County Court. This issue has been decided adversely to the position taken by appellant in several cases. *State v. Hightower,* S. C., 69 S. E. (2d) 363; *State v. Farne,* 190 S. C. 75, 1 S. E. (2d) 912; *State v. McAdams,* 167 S. C. 405, 166 S. E. 405.

In the foregoing cases, the principle has been announced and re-announced that if an overt act in pursuance of the conspiracy is committed in a jurisdiction other than that where the combination was made, the conspirators may be prosecuted in the place where the overt act was committed. The law considers that wherever the conspirators act, there they continue the agreement, and this agreement is continued as to all wherever one of them does an act in furtherance of their common design.

Of course, for the Richland County Court to have jurisdiction to try the appellant for conspiracy, it must be alleged and proved that the conspiracy was entered into, and that in furtherance of the conspiracy there was an overt act which took place in Richland County. An examination of the indictment and of the record will show that such requirements have been met. It is needless to re-state the contents of the indictment here.

We next consider whether the Court erred in refusing to direct a verdict of not guilty for appellant at the close of the State's evidence, and also in refusing to grant a new trial upon the ground that the evidence was insufficient to sustain a conviction of conspiracy, or that the appellant was in any way connected with the same.

The appellant, Goff, offered no evidence; neither did any of the other defendants charged in the indictment. So on this issue we proceed to consider the evidence introduced by the State.

An examination of the record shows that officers from the sheriff's office in Lexington County and other police officials raided what was presumed to be an abandoned building called "Green Acres," in Lexington County, just outside the limits of West Columbia, on September 28, 1950. This building had formerly been operated as a restaurant by the defendant, Harry Goff, but it had been closed pursuant to an order of court. This raid was made about 12:30 o'clock p. m. on the day in question, in consequence of explicit in-

formation that a lottery or "Numbers Game" was being operated there. The officers found the building barricaded with steel bars in the windows. After much effort, the building was broken into by the officers, and they found inside two Negroes and a white man. They discovered that an air conditioning system had been in use; and before their forced entrance five or six telephones admittedly had been torn from the wall.

There were two safes in the building. The three men referred to claimed they could not open the safe in the front room. After some delay, an expert was secured who succeeded in opening it. The officers took from the safe a large number of lottery tickets, with daily tabulations of total amounts represented by the tickets. These tickets had been sold by "Writers," as they were called, who operated in West Columbia, in Lexington County, and in the City of Columbia, in Richland County. They found slips of paper with telephone numbers opposite certain figures. These figures were identified by the evidence as the writing numbers of various Writers living and operating in the City of Columbia, and the telephone numbers were those by which they could be reached.

We will not undertake to explain in detail the operation of the Numbers Game, which the evidence tends to show was carried on by the defendant and his confederates. The lucky or winning number was determined by the bond and stock market reports published in the daily newspapers.

Before the officers gained entrance to the Green Acres building, they observed an automobile approaching on the road leading thereto. When opposite the building, the car slowed down and came practically to a stop, and then raced away. It was driven by the appellant, Goff, as shown by the record; and although the officers gave chase, they were unable to overtake this car, and finally lost sight of it. The evidence tends to show that his codefendant, McIntire, was in active charge of the lottery operation at Green Acres, which as stated, permeated both Lexington and Richland Counties.

In the afternoon of September 28, 1950, after the raid at Green Acres, the appellant, Goff, and his codefendant, McIntire, were arrested by the officers at a filling station in Columbia. They were enroute to the police station when Goff was told by the officers that they had been unable to open a safe which they found in the back room of the Green Acres building . Goff stated that the safe was his, and offered to open it for them. When they reached the building, the officers and Goff entered this back room and Goff opened the safe at the request of the officers. From this safe, the officers removed, among other things, two cards bearing most of the same figures and telephone numbers as found in the first safe referred to. As above stated, these figures were identified as writing numbers of the Writers who sold the chances in the lottery, and also their telephone numbers.

On the day before the raid was made at Green Acres, the officers searched the home of McIntire, and found upon his desk a cash book and ledger. In this book were found daily statements of receipts from the lottery operation and the winning numbers as determined from the newspapers. In addition to the daily record so kept, there was a total tabulation of "Take Ins" and "Paid Outs" for each week; and also records of payments for telephones identified by the evidence as those in Green Acres. Three of these telephones were listed and paid for by the appellant, Harry Goff.

Throughout this book taken from the McIntire home appeared the records of disbursements stated in the form of "Take Downs," from which it can be clearly inferred that a partnership existed between McIntire, whose nickname was "Shorty," and Goff, who is referred to as Harry. For instance, at Page 4 in the book this appears: "Harry Take Down, $1,000.00; Shorty Take Down, $1,000.00." An examination of the book further showed that whenever there was a "Take Down" for Shorty, there was a like "Take Down" for Harry. One of the police officers testified as to the intimacy between the appellant, Harry Goff, and his co-

defendant, Shorty McIntire; and that he knew of no associate of McIntire by the name of "Harry" other than Harry Goff.

A reading of the record convinces us that there was ample evidence which warranted the trial judge in submitting this case as to the appellant, Goff, on both counts of the indictment. The testimony shows a conspiracy on a wide scale, in which the appellant and others combined to commit an unlawful act; and we see no error. As was said in the case of *State v. Hightower,* S. C., 69 S. E. (2d) 363, 369, which we think has a direct bearing on the issue under discussion:

"Conspiracies may and generally must be proved by a number of indefinite circumstances which vary according to the objects to be accomplished. Any circumstance or act standing alone might have little weight, but, taken collectively, they point unerringly to the existence of the conspiracy. *Bloomer v. State,* 48 Md. 521. And as stated by the Court in *State v. Anderson,* 208 N. C. 771, 182 S. E. 643, 652: 'When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose.' And see Annotation, Vol. 3 Am. St. Rep., Page 482."

Did the trial judge err in refusing to grant appellant's motion made prior to the trial for a separate trial or severance? It is argued that the denial of the motion constituted an abuse of discretion, as it was impossible for appellant to obtain a fair and impartial trial with the numerous defendants involved, the numerous attorneys employed by the individual defendants, the type of case, and the divergent and conflicting interests.

The determination whether a motion for severance of trial should be granted always rests within the sound discretion of the trial judge. There can be no

clearly defined rule for determining when a defendant is entitled to a separate trial, because the exercise of discretion means that the decision must be based upon a just and proper consideration of the particular circumstances which are presented to the court in each case. And the trial court's decision will not be disturbed unless legal error is shown. *State v. Hurt,* 212 S. C. 461, 48 S. E. (2d) 313; *State v. McCracken,* 211 S. C. 52, 43 S. E. (2d) 607; *State v. Atkins,* 205 S. C. 450, 32 S. E. (2d) 372.

It is always cumbersome to try a great number of defendants at one time. Here the indictment charges twenty-two persons. With such a large number there might be danger of some of them being lost sight of by the jury, and their case considered by the jury in a rather vague way. The argument that it would be far more expensive to have separate trials should not enter into a consideration of this question.

However, it must be borne in mind that we are dealing with a case of conspiracy, which usually involves a considerable number of people. The very nature of the offense contemplates many defendants. And upon an examination of the record it will be found that the defenses of the various defendants are not separate and distinct. While the participation of the various defendants in the conspiracy is different, nevertheless the difference of participation as shown by the evidence would not be such as to justify a severance of the case of one or more of the defendants from the remaining defendants. In our opinion, the trial judge exercised a sound discretion in refusing a severance.

Did the trial judge err in directing that there should be an alternate or thirteenth juror? The error assigned, being that in so directing the trial court deprived appellant of his rights under Article V, Section 22 of our Constitution of 1895, which provides that the petit jury of the circuit courts shall consist of twelve men, all of whom must be agreed as to a verdict in order to render the same.

By this exception the appellant attacks as unconstitutional Section 626-2 of the Code of 1942. This section grants to the presiding judge, where a trial is likely to be a protracted one, the right to "direct the calling of one or two additional jurors in its discretion, to be known as alternate jurors." The section goes on to provide that any alternate juror as provided in this section shall sit with the jury panel charged with the case and shall have the same opportunities for seeing and hearing the proceedings, and shall take the same oath as the jurors already sworn. The alternate juror takes no part in the decision of the case unless a vacancy occurs on the jury panel through death, illness or other disability. This section likewise provides that if the regular jurors are ordered to be kept in custody by the court during the trial of a cause, such alternate juror shall also be kept in confinement with the other jurors, and shall be discharged upon the final submission of the case to the jury, unless he is called upon to sit on the panel because of the disability of some acting juror.

In this case, an alternate juror was called and sat with the jury panel throughout the trial, but no juror on the regular panel suffered any disability, and the alternate juror prior to the submission of the case to the jury, was discharged. The appellant takes the position that the thirteenth or alternate juror, while not participating in the consideration or rendition of the verdict, might be of such character as to exert a persuasive influence on the jury panel prior to his discharge. We think there is no merit in this contention.

Statutes of this kind are common in many states of the union, and in our opinion do not in any respect contravene our constitutional provision. 31 Am. Jur., Sec. 99, Page 630; 50 C. J. S., Juries, § 123-d, page 842; Annotations, 96 A. L. R. 793, 109 A. L. R. 1495. Such a statute is remedial and is intended to prevent mistrials in criminal cases of long duration where a juror dies or becomes so ill as to be unable to continue his duties. Similar

statutes have been sustained in *State v. Dolbow,* 117 N. J. Law 560, 189 A. 915, 109 A. L. R. 1488; *People v. Mitchell,* 266 N. Y. 15, 193 N. E. 445, 96 A. L. R. 791; *People v. Peete,* 54 Cal. App. 333, 202 P. 51; and *State v. Dalton,* 206 N. C. 507, 174 S. E. 422.

It is urged that the Court erred in sentencing the appellant to three years in the state penitentiary under the first count of the indictment, the error assigned being that the sentence is a violation of Section 1038 of the 1942 Code, and Article I, Section 19 of our State Constitution of 1895.

Appellant was convicted upon two counts. The first count charged him with conspiring to set up a lottery; the second charged a violation of Code Section 1231, which makes it unlawful to set up a lottery and provides the punishment for so doing.

It is contended that there is no statute providing punishment for conspiring to set up a lottery. Section 1231, which creates a substantive offense and makes it unlawful to set up a lottery, designates the crime as a misdemeanor, and provides a penalty of one year in the penitentiary or a fine of $1,000, or both. The position is taken that there is no statute fixing a sentence for conspiring to set up a lottery, as charged in the first count.

Section 1038 of the Code provides: "In cases of legal conviction, where no punishment is provided by statute, the court shall award such sentence as is conformable to the common usage and practice in this State, according to the nature of the offense, and not repugnant to the Constitution." It is argued that the sentence on the first count is not conformable "to the common usage and practice in this State, according to the nature of the offense".

The issue presented by the appellant has been answered contrary to his contention as shown by the case of *State v. Ferguson,* S. C., 70 S. E. (2d) 355, 358. In that case the court said:

"Conspiracy is a common-law offense and is a misdemeanor. No maximum limit being fixed by statute for this crime, the punishment is governed by Article I, Section 19 of the Constitution, and by Section 1038 of the Code. The Constitution prohibits cruel and unusual punishment. The statute, section 1038, says that the Court shall award such sentence as is conformable to the common usage and practice in this State, according to the nature of the offense. We do not think that the sentence in this case conflicts with these requirements. Among cases in which varying sentences have been imposed for conspiracy are *State v. McAdams,* 167 S. C. 405, 166 S. E. 405; *State v. Davis,* 88 S. C. 229, 70 S. E. 811, 34 L. R. A., N. S., 295; *State v. Ameker,* above [73 S. C. 330, 53 S. E. 484]; *State v. Cordoza,* 11 S. C. 195. 'Only under rare and unusual circumstances will this court interfere with the discretion of the trial judge in the imposition of a sentence.' *State v. Kimbrough,* 212 S. C. 348, 46 S. E. (2d) 273, 277."

The final and in our opinion the most serious question raised by the appeal has to do with the time allowed by the court to the attorneys representing the appellant and his codefendants in making their reply argument. The appellant argues that he was prejudiced by the court's ruling that each of the defendants could have only five minutes in which to make a reply argument. Neither the appellant nor any of his codefendants offered any evidence in order to have the right to the opening argument and the closing argument.

In this case there were eleven witnesses for the state and twenty one codefendants. Seven attorneys represented the various defendants. The defendants when the issue of time within which to make arguments arose, offered to waive the right to open so as to give them the full opportunity to make reply to the argument of the solicitor. The trial judge, however, required counsel for the various defendants to make the opening argument before the jury. This was done, and they were followed by the argument for the State made by the solicitor.

The trial judge first ruled that he would allow only one of the attorneys for the defendants to reply to the argument of the solicitor, and that they would have to agree among themselves as to which attorney should make this reply. This was vigorously objected to, but the objection was unavailing. After one argument had been made by one of the attorneys for one of the defendants the court stated that if the various attorneys representing the defendants could not agree upon one of the attorney's making the closing argument, he would allow each attorney a five minute reply. Following this ruling, the other attorneys, including the attorney for the appellant, made a five minute argument, but before so doing, protested the ruling which limited them to this length of time.

In *State v. Garlington,* 90 S. C. 138, 72 S. E. 564, 566, the Court in passing upon the question whether the defendant in a criminal case who has a right to open and reply in argument, may waive either or both of these rights, said: "It may be true, furthermore, that the defendant in a criminal case, having the right to reply in argument by reason of not introducing evidence, may decline to open an argument and still retain the right to make the closing argument to the jury, either upon the case in general or by way of reply to any contention on the part of the state."

In the case at bar, appellant's counsel offered to waive the opening argument if the trial court would allow him to fully reply to the argument of the solicitor. The trial judge refused this, but later made his alternative offer of allowing each of the seven attorneys representing the various defendants five minutes in reply.

The principle above announced in *State v. Garlington,* 90 S. C. 138, 72 S. E. 564 is next referred to in *State v. Atterbery,* 129 S. C. 464, 124 S. E. 648. And the ruling in the *Garlington case* is approved in the case of *State v. Gellis,* 158 S. C. 471, 155 S. E. 849.

Section 325 of the Code 1942 relates to the length of argument by counsel and provides that "No attorney, solicitor, or counsellor shall be allowed to occupy more than two hours of the time of the court in the argument of any cause, unless he shall first obtain the special permission of the court to do so."

In connection with this statute, Rule 31 of the South Carolina Circuit Court Rules, provides that "not more than one counsel on each side shall sum up or be heard in any cause;" and, further, "Provided, that the time of two hours, allowed by Statute, may be distributed among as many counsel on each side as they may desire."

This issue was discussed in the case of *State v. Ballenger,* 202 S. C. 155, 24 S. E. (2d) 175. That was a murder case in which twenty two witnesses had testified, and the court allowed only one hour to the defense for argument. It was held under the constitutional guarantee to the accused to be fully heard in view of Code Section 325, that the court committed error in limiting and reducing the time to less than two hours. It is argued here that if an accused is entitled to two hours in a case warranting an argument for such length of time, it is manifest error to allow counsel for the accused only one twenty-fourth of that time within which to make a reply argument, he having waived the right to make the opening argument.

In *State v. Cash,* 138 S. C. 167, 136 S. E. 222, which was a murder case, the counsel were limited to one hour for argument on each side, over the protest of the defendant's counsel who claimed that they could not sum up the cause and properly present the case of the defendants to the jury in that length of time, as there were some twenty five witnesses who testified. The court held that under the circumstances in that case full time should have been allowed counsel for the defense to present the case to the jury, and that there was error in limiting the time to one hour for this purpose. It was held in *State v. Blackstone,* 113 S. C. 528, 101 S. E.

845, 846, in considering Section 325 of the Code, concerning the time limit for argument, that the statute fixes no minimum; "This is wisely left to the discretion of the trial court".

The Constitution does not specify the time nor the number of counsel to which an individual defendant in a criminal case is entitled. It provides that he has the right "to be fully heard in his defence by himself or by his counsel or by both." Const. art. 1, § 18. This provision guarantees him the right to be heard on all questions of law and fact which may arise at any time during the prosecution, and it implies that he shall have full opportunity and time as justice and the necessities of the case may require. The trial court is invested with a large and very responsible discretion in determining and affording to the accused the full measure of his constitutional and statutory right. Where the question depends on the manner in which the discretion has been exercised, the duty of this court in reviewing the conclusion of the trial court is often difficult.

In this case the trial consumed four days; there were twenty-two defendants, eleven witnesses and seven counsel representing various defendants, and the evidence reported to this court makes a printed volume of approximately three hundred pages.

The right to be fully heard has always been regarded as one of greatest value, not only to the accused, but to the due administration of justice, and any limitation of this right which has seemed to deprive the accused of a full and fair hearing has generally been held error, entitling the defendant to a new trial. Under the circumstances here disclosed (the appellant having offered to waive the opening argument), we are constrained to hold that the limitation of five minutes was too restrictive to allow a full discussion of appellant's defense by way of reply. In view of this conclusion, we think a new trial must be granted to the appellant; and it is so ordered.

522

Judgment reversed.

STUKES, TAYLOR and OXNER, JJ., and G. BADGER BAKER, A. A. J., concur.