## 18121

The STATE, Respondent, v. Billy S. FLEMING and Isaac Tindal, Appellants

(133 S. E. (2d) 800)

*Messrs. Jenkins & Perry,* of Columbia, and *Ernest A. Finney, Jr.,* of Sumter, *for Appellant, Billy S. Fleming,*

R. Kirk McLeod, Esq., Solicitor, of Sumter, for Respondent,

November 12, 1963.

BRAILSFORD, Justice.

At the January, 1963, term of the Court of General Sessions for Clarendon County, the grand jury indicted Billy S. Fleming, Isaac Tindal and John S. Holden, charging that, between April 15 and August 30, 1959, they "did unlawfully and feloniously combine, conspire and confederate to defraud the Ocean City Life Insurance Company * * * by means of a scheme to have issued to divers persons, policies of (life) insurance * * * (such persons) being unaware and not having applied for any of said insurance and their signatures having been placed upon the applications * * * by the said John S. Holden at the request of Billy S. Fleming, the premiums therefor having been paid by the said Isaac Tindal * * *, all for the purpose of defrauding the Ocean City Life Insurance Company * * *."

In six numbered sub-paragraphs the indictment then alleges specific instances in which policies of life insurance were procured on forged applications, without the knowledge of the persons on whose lives the policies were issued.

Of the three alleged conspirators, Fleming and Tindal were tried and convicted. (Holden testified as a witness for the prosecution.) Both defendants appealed but the appeal of Tindal has been abandoned.

The first exception charges that the court erred in failing to hold "the indictment is vague, indefinite and uncertain and

does not substantially set forth the offense charged, thus failing to provide appellant with sufficient information to meet the charge as is required * * *."

In the trial court, appellant contended that the indictment was vague and indefinite in failing to specify, (a) the date of the offense; (b) the "form and manner" in which Fleming requested Holden to sign the applications for insurance policies; (c) "in what way the defendant Billy Fleming was to have benefited" from the procurement of the insurance policies; and (d) "in what manner or form the premium payments were made."

No mention is made in the brief of specifications (a) and (b) and they are deemed abandoned. Pecuniary benefit, realized or anticipated, is not an element of the offense charged. 15 C. J. S. Conspiracy § 78 b. Therefore, the indictment was not deficient in failing to specify in what way Fleming was to have benefited.

The conspiracy paragraph of the indictment plainly charges that the premiums were paid by Tindal. Each of the sub-paragraphs charges that the premiums were collected by Holden "from Isaac Tindal, through Billy S. Fleming * * *." In other words, that Tindal furnished the money to Fleming, who turned it over to Holden, the insurance company's agent. No more specific allegation was necessary or appropriate in an indictment in which evidentiary matter need not be included. *State v. McIntire,* 221 S. C. 504, 71 S. E. (2d) 410.

The second exception charges error in the court's failure to quash the indictment upon the ground that "the same was returned by a grand jury from which members of the Negro race are systematically excluded or limited in number * * *."

The third exception charges error in the refusal of the court to quash the panel of petit jurors upon the same ground.

It appears from the record that in 1961 an indictment returned by the grand jury of Clarendon County against a

Negro was quashed by the presiding judge upon the ground that the evidence showed a systematic exclusion of members of his race from the grand jury. The evidence at that time disclosed that no negro had served on the grand jury from 1935 to 1961 and not more than one negro on the petit jury during the same period.

The clerk of court, *ex officio* a member of the jury commission, was the only witness called by the appellant in support of his motions to quash. The testimony of this witness is summarized in appellant's brief, as follows:

"Clerk of Court for Clarendon County, P. T. Bradham, one of the Jury Commissioners, testified that he has been Clerk of Court for Clarendon County since 1935 and prior to 1962 no Negro had served upon the Grand Jury of that County. He testified that 'one served in 1962 and is a hold-over for 1963 on the Grand Jury.' Further testimony was that several Negroes had been called to serve on the petit jury in the 'past two years' but that at no time had more than one Negro been called to serve at any one time. There are approximately 1200 qualified male electors in Clarendon County of whom about 35 are Negroes. However, approximately 60% of the County's population are Negroes."

The witness, when asked for a numerical estimate of how many negroes had served on the petit jury in 1961 and 1962, stated that there had been 7 or 8. He further testified that of approximately 35 negro qualified male electors in the county, the names of about 25 were in the jury box, from which grand and petit jurors are drawn by lot.

We are satisfied that the record fails to establish racial discrimination in the selection and composition of the grand jury which indicted appellant or of the petit jury by which he was tried. The undisputed testimony that of approximately 1200 qualified male electors in the county only about 35 were Negroes refutes any contrary inference which might be drawn from the relatively small number of Negro jurors, should only population figures be con-

sidered. Appellant simply failed to meet the burden of proving the ground of his motion, as is required. *State v. Waitus,* 224 S. C. 12, 77 S. E. (2d) 256.

The fourth exception has been abandoned.

The fifth exception is based upon the claimed insufficiency of the evidence to establish appellant's guilt of the offense charged and assigns as error the court's refusal to direct a verdict of acquittal on this ground. A brief statement of the facts is required.

John S. Holden was agent at Manning, South Carolina, for Ocean City Life Insurance Company, a small company with its home office at Myrtle Beach, South Carolina. Billy S. Fleming, a resident of Manning, was engaged in the undertaking business and in the business of writing fire and casualty insurance. Isaac Tindal operated a liquor store in Florence, South Carolina. Over a period of years, Tindal invested rather heavily in insurance policies on the lives of other persons, irrespective of whether he had an insurable interest in such lives.

Fleming and Tindal had known each other for many years and Holden had had business relations with both of them. Inferentially, Holden and Fleming knew of Tindal's interest in speculating on life insurance policies.

Between April 13 and August 27, 1959, Holden submitted applications to Ocean City Life Insurance Company for six policies of life insurance as follows:

| Insured | Beneficiary Relationship | Amount |
|---|---|---|
| Henry Brown | Rachel Brown, sister | $1,000.00 |
| Melvin Brown | Rachel Brown, sister | 1,000.00 |
| Wm. Henry Melvin | Phosia Briggs, sister | 1,000.00 |
| Ernest Keene | Rachel Brown, sister | 1,000.00 |
| Dan Green | Isaac Tindal, brother-in-law | 1,000.00 |
| Eddie Tomlin | Ruth McFadden, sister | 500.00 |

The policies applied for were duly issued. The record does not disclose to whom they were delivered. However, the

initial and subsequent premiums were paid to Holden by Fleming, with funds or checks supplied by Tindal, until Holden became ill, and another agent was assigned to his debit. This agent continued the practice of collecting premiums on the six policies from Fleming, usually in cash, at least once by check of Tindal. He also undertook to locate the persons whose lives were insured, and, except for Ernest Keene, was unable to do so. After interviewing Keene, he made a report to his company. An officer of the company then called on Fleming, who advised him that he was paying the premiums for Tindal. This officer then obtained the policies from Tindal for cancellation and refunded the premiums. He made a report of the incident to the South Carolina Insurance Department. An investigation by agents of the Department and of the South Carolina Law Enforcement Division followed.

Two of the investigating agents testified that they found some 500 insurance policies in Tindal's possession. Tindal denied that he had nearly so many but admitted that he had more than 100 policies on the lives of relatives and friends, which had been issued by some ten or twelve companies, and that the premiums on them amounted to approximately $500.00 per month.

Tindal testified that he had received a message that Holden was interested in obtaining some of his insurance business. He denied having discussed the issuance of any of the six policies with either Holden or Fleming and was uncertain how this had been accomplished. Fleming categorically denied any connection with the transactions, except for the transmission of premiums received from Tindal to Holden. On the other hand, Holden's testimony, while indefinite as to an agreement to defraud or to do any illegal act, clearly implicated Fleming as the intermediary in procuring the issuance of the policies by unlawful means.

We must assume that Tindal selected the risks to be insured, because five of the six resided in the Florence area

and were unknown to either Fleming or Holden. The latter testified that he completed each of the six applications from information furnished him by Fleming, who told him that Tindal would pay the premiums. At Fleming's request, he signed each applicant's name to the application, falsely representing to the company that the applicant had signed in person, in the agent's presence, and appeared to be in good health.

While Fleming knew only one of the named applicants, he knew all of the beneficiaries and knew that their relationships were falsely stated in the applications. He knew that Rachel Brown, named as beneficiary in three of the applications, and Phosia Briggs, named in one, were Tindal's sisters, and not sisters of the named applicants, as represented to the insurance company. He also knew that Tindal was not a brother-in-law of Dan Green, as represented in another application; and that Ruth McFadden was not a sister of Eddie Tomlin, as represented in the final application.

Although Tindal was mentioned in only one application, it is reasonably inferable from the evidence that both Fleming and Holden understood that he would own all six policies. Holden testified that it did not occur to him to secure the signatures of the named applicants; that Fleming told him he "was anxious to get this business on the books."

Two of the six insureds died before they could be interviewed by the investigating officers and two more died before the trial. Both of the survivors testified that Tindal had requested permission to take out policies on their lives and that they had not objected. However, one of them stated that he had expected to sign the application if a policy on his life should be applied for and that he knew nothing of the existence of such a policy until he was advised of it by the officers.

Conspiracy is defined by Section 16-550, Code of Laws 1962, as follows:

"The crime known to the common law as 'conspiracy' is hereby defined as a combination between two or more per-

sons for the purpose of accomplishing a criminal or unlawful object or an object neither criminal nor unlawful by criminal or unlawful means."

The foregoing statute is declaratory of the common law definition of conspiracy. *State v. Jacobs,* 238 S. C. 234, 119 S. E. (2d) 735, and authorities cited therein. It need not be shown that either the object or the means agreed upon is an indictable offense in order to establish a criminal conspiracy. It is sufficient if the one or the other is unlawful. *State v. Davis,* 88 S. C. 229, 70 S. E. 811. Nor need a formal or express agreement be established. A tacit, mutual understanding, resulting in the willful and intentional adoption of a common design by two or more persons is sufficient, provided the common purpose is to do an unlawful act either as a means or an end. 15 C. J. S. Conspiracy § 40. Although the offense of conspiracy may be complete without proof of overt acts, such "acts may nevertheless be shown, since from them an inference may be drawn as to the existence and object of the conspiracy. It sometimes happens that the conspiracy can be proved in no other way." *State v. Hightower,* 221 S. C. 91, 69 S. E. (2d) 363. "To establish sufficiently the existence of the conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties. The circumstantial evidence and the conduct of the parties may consist of concert of action." 15 C. J. C. Conspiracy § 93a.

Bearing in mind that on a motion for a directed verdict in a criminal case, the issue is whether there is any evidence reasonably tending to establish guilt (*State v. Riley,* 219 S. C. 112, 64 S. E. (2d) 127), we think that there was ample testimony to require the submission of the case to the jury.

Although there is no direct evidence of an express agreement to do an unlawful act, Holden testified, in effect, that

he and Fleming agreed to cooperate in the procurement of insurance policies, for which Tindal agreed to pay the premiums and which could not be obtained by fair dealing. It is reasonably inferable from the testimony that the unlawful acts done in procuring these policies were done in accordance with this prior agreement. At least, the evidence as to sustained concert of action over a period of months, following a fixed pattern of forgery and misrepresentation, is sufficient to justify a finding that there was a tacit, mutual understanding between Holden and Fleming to commit these unlawful acts.

Sitting, as we do, to review errors of law only, we can not properly give weight to the argument, that Holden's testimony implicating appellant was incredible. If an injustice was done by an erroneous verdict, appellant's only remedy, which he did not pursue, was a motion for a new trial in the court below upon the ground that the verdict was against the clear weight of the evidence. Such a motion would have invoked the trial judge's supervisory authority over jury verdicts. Appellant's attack on Holden's testimony is without relevance to the issues properly before us.

The final exception charges error in allowing testimony "concerning certain alleged admissions of the appellant Tindal, the *corpus delicti* having not been established."

We gave no weight to any testimony concerning extrajudicial admissions by Tindal in determining that the issue as to appellant's guilt was properly submitted to the jury. It necessarily follows that, in our view, there was sufficient evidence to establish the *Corpus delicti* independently of any such admission. Therefore, the exception is without merit. The further ground on which appellant contends that this testimony was objectionable is beyond the scope of his exception and need not be stated.

Affirmed.

TAYLOR, C. J., and MOSS, LEWIS and BUSSEY, JJ., concur.