# Richmond

JOSEPH OSSEN v. COMMONWEALTH OF VIRGINIA.

June 14, 1948.

Record No. 3355.

Present, All the Justices.

The opinion states the case.

*W. R. Ashburn* and *Broudy & Broudy*, for the plaintiff in error.

*Henry T. Wickham, Special Assistant to the Attorney General*, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Joseph Ossen was indicted on two counts charging him with corruptly giving and offering to give to an executive

officer a gift or gratuity, with intent to influence the act and decision of the executive officer in the performance of his duties in a matter then pending before him in his official capacity. Virginia Code, 1942, (Michie), section 4496. He pleaded not guilty. Upon his trial he relied upon the defense of entrapment. The trial court refused to submit the issue of entrapment to the jury and denied a motion to strike the evidence of the Commonwealth as insufficient to sustain a verdict of guilty. The defendant was found guilty and his punishment fixed at five years in the penitentiary. After denial of a motion to set aside the verdict as contrary to the law and the evidence, the defendant was sentenced in accordance with the verdict of the jury.

In a written opinion the trial court held there was no evidence of entrapment, and that the defendant was guilty of bribery by his own admission.

From the judgment against him the defendant obtained this writ of error.

There are numerous exceptions to the rulings of the court on the admission and exclusion of evidence and to the refusal of instructions tendered by the defendant. The principal grounds of error relate to the refusal to submit to the jury the question of entrapment of the defendant; and in connection therewith the refusal of the court to allow inspection and proof of a prior written statement of a Commonwealth's witness for the purpose of impeaching him.

The evidence is somewhat voluminous. For a proper understanding of the questions raised before us, it is necessary to show the background of the case and recite so much of the evidence as relates to the errors assigned.

On November 19, 1946, a warrant was issued on the complaint of Leon Nowitzky, a police officer, charging Joseph Ossen with the murder of Carrie Spady. Nowitzky was in charge of the homicide division of the Norfolk Police Department, and was also assigned to the office of the city coroner to investigate death by violence. In the pursuit

of his duty, he had investigated the death of Carrie Spady, who died on November 16, 1946, from a bullet fired from a pistol. Her body was found in an apartment which she shared with Ossen.

After a preliminary hearing before a police justice of the city of Norfolk, Ossen was held for the January, 1947, grand jury of the Corporation Court of that city. The sole witness at the preliminary hearing was Officer Nowitzky, and we are told the only evidence to show the commission of a crime was the opinion of Nowitzky that since there were no powder burns at the point of the entry of the bullet in the body of Carrie Spady, the wound could not have been self-inflicted.

Several days after that hearing, Ossen was shown a textbook by his attorneys, which held that where a bullet is discharged from a revolver muzzle held against the upper part of the human head, no powder burns will appear at the point of entrance of the bullet.*

Thereafter and prior to the meeting of the grand jury, occurred certain circumstances, engagements, and arrangements, which led to a gift of $3,500 by Ossen to Nowitzky and brought on this prosecution. The evidence in connection therewith is in conflict.

Frank West was a principal witness for the Commonwealth. West had been a close, personal friend of Nowitzky for twenty-five years, and for several preceding years had met the officer nearly every morning for coffee at a cafe near the police station. He had, for two years, been engaged in business as a professional bondsman, and Nowitzky had assisted him in obtaining his qualification for that employment. Prior to becoming a bondsman, West had owned and operated a travelling carnival. He was a member of a fraternal organization which was managed by Nowitzky, and Nowitzky had sometimes taken West with him when he was going to make arrests, and had more than once

---

*Ossen was acquitted of the charge of murder upon a trial therefor, held subsequent to his conviction in this case. At that trial expert witnesses for both the Commonwealth and the defense agreed with the opinion of the author of the textbook.

called West to qualify as a bondsman for persons charged with crime.

West testified that early in December, on a Norfolk street corner, Ossen, although previously unknown to him, approached him with the proposal that, "If you can get Leon Nowitzky to throw the case out that is against me before the grand jury, I will give him three grand."

Ossen explained that he was innocent of the murder charge, and that Nowitzky was mistaken in his contention that a contact shot would leave powder burns at the point of entrance of the bullet. He desired Nowitzky to make tests to prove his error.

West said he met Nowitzky three or four days later and told him what Ossen had said. He telephoned Ossen and told him he had talked with Nowitzky. Ossen told him to offer Nowitzky $3,500, with the understanding that his case would have to be dismissed by the grand jury, otherwise he would not give him a penny. There were several other telephone conversations between West and Ossen, and Ossen expressed a desire to meet Nowitzky as soon as possible. West, in the meantime, communicated with Nowitzky and arrangements were made for Ossen to meet the latter on December 24th, at 9:00 o'clock p. m., in an alley near the Pythian Castle. Earlier in the evening of December 24th, West met Ossen in front of the Pythian Castle and told the latter to return at 9:00 p. m. At 9:00 p. m. Ossen returned, met West, and the two proceeded to the parked automobile of Nowitzky where the proposal of Ossen was to be made to Nowitzky. West said he then left; that he did not know whether Nowitzky would take the money or not; or whether Ossen was going to be arrested.

Nowitzky testified that on December 9, 1946, he had a conversation with West concerning the murder charge against Ossen; that he talked to West on December 10th, and on four separate occasions on December 24th; that he informed his superior officers of his conversations; and on the evening of December 24th, by pre-arrangement with

Captain F. E. Watson, his superior officer, he parked his car in the alley way in the rear of the Pythian Castle; that three or four officers concealed themselves in the immediate vicinity; and that at 9:00 o'clock he walked out of the Pythian Castle to his car and found Ossen sitting on the right-hand side of the front seat. He spoke to Ossen and asked him if he had brought him some money. Ossen replied that he had, and asked him if he had ever tried plastics in making tests for powder burns. After a discussion, Nowitzky promised to make the tests. Later, at a signal, the lights of the car were cut off, and Ossen handed a roll of money, $3,500, to Nowitzky. At that moment one of the doors of the car opened; the waiting police officers stepped up; and one of them took a flashlight picture of the scene. Ossen was arrested and carried to police headquarters, charged with bribery.

Nowitzky denied that he ever "suggested" that Ossen bring any money to him; but said that after he had talked with West, he told the latter to bring Ossen to their place of meeting. Nowitzky said that his superior officers made the plans for his meeting with Ossen. One of such officers said that all of the plans were made by Nowitzky.

For the defense, two witnesses testified that about two weeks before December 24, 1946, West sought, through them, to make contact with Ossen; that West obtained Ossen's telephone number from them, and also caused one of them to make an engagement for Ossen to meet West.

Ossen testified that A. D. Minutolo, one of the above witnesses, accordingly came to his apartment and told him that he had been talking to a Mr. West, who said that he wanted to get in touch with him because he had some information which could be of benefit to him in his case; that he gave Minutolo two telephone numbers, one at his apartment and the other at the Monticello Hotel; that the next day he got a telephone message from John Cimmino to meet West at Bank and Freemason streets; and that pursuant to that engagement, he went to the designated place and there met West. He said he did not know West per-

sonally; but had been to the latter's carnival, where he was pointed out as the manager of the show. When he arrived at the meeting place, he blew the horn of his car and West came up. Ossen gave West his name. West then got in the car and they drove out to the Virginia Beach Boulevard.

Ossen said that when West "first got in the car he said that he had discussed my case with Nowitzky before coming to see me." During this drive they had a conversation in which West said that he had been a friend of Nowitzky for a number of years; that Nowitzky had helped him to go into the bonding business; and he thought "he (Nowitzky) could do me some good in my case." Asked what good he could do, West replied, "When your case comes up before the Corporation Court, I could get Mr. Nowitzky to get you dismissed." Some further conversations took place, and West said, "I will have further talks with Mr. Nowitzky and I think he can get your case *nolle prossed* before the grand jury." West then promised to get Nowitzky to make some ballistic tests on plastics. They parted, after West again got Ossen's telephone number, with the promise of West that he would call Ossen after he saw Nowitzky again.

On the following day West called Ossen by telephone, and said that he had seen Nowitzky and that the latter "had promised to make more tests and would let him know and he would let me know." They had subsequent telephone conversations and later met again at City Hall and Bank street. West said he "had talked to Nowitzky and that everything was shaping up all right." West then said that they would have to talk about the money part of it because he had done business with Nowitzky before and Nowitzky would require a great deal of money. He advised Ossen that by the use of the money he could save himself the trouble, expense and embarrassment of going to trial, and suggested that he put up $5,000.

On the 23rd of December, West told Ossen that everything was all right, and that he would tell him where to

go to meet Nowitzky and how to give the money. He said that Nowitzky did not want a third party present, but wanted to receive the money personally. Finally, West said "Instead of giving him $5,000 you only give him $3,500 and give me $1,500 if your case is *nolle prossed*, and when you give this money to Nowitzky, don't tell him that you have promised me $1,500."

Ossen said West called him by telephone on the morning of December 24th, and made an engagement to meet him at the rear of the Pythian Castle that evening. They met there at 9:00 o'clock. West took Ossen to Nowitzky's automobile, directed him into the front seat, and stood beside the car and talked with him until Nowitzky came and entered the car. Nowitzky immediately asked Ossen whether he had seen Frank West. Ossen said that he had, and asked Nowitzky whether he had made further ballistic tests and was told that he had not, but would do so. Then occurred the tender of the money, and Nowitzky's promise to return it "if I don't get your case *nolle prossed*."

The arrest of Ossen followed. On the way to the police station, with Nowitzky driving, Ossen in the front seat beside him, and three police officers in the rear seat, Nowitzky said to Ossen "Were you fool enough to think that I would go through with this thing?" To which Ossen replied, "It was your suggestion." Nowitzky then said, "Have I seen you since the police court trial?" Ossen replied "No." Nowitzky denied this conversation; but two of the police officers corroborated Ossen.

About 11:00 p. m. on December 24th, West again met Nowitzky at the Pythian Castle. He was not questioned concerning his part in the affair until January 3, 1947, when he was directed to police headquarters by Nowitzky. There in the presence of Nowitzky, three other police officers, the Attorney for the Commonwealth, and the latter's assistant, he made a statement purporting to contain his full knowledge of everything that occurred in connection with the charge of bribery against Ossen. The statement was taken down by a stenographer, transcribed, and signed by West.

West, in his testimony, had declared that he thought Nowitzky would accept the $3,500 from Ossen, and that he was surprised to learn Ossen had been arrested when the offer was made. He positively denied that he had told the officers that he expected Ossen to be arrested. Anticipating the impeachment of West by the defense, the Commonwealth was allowed to show by a police officer, who was present when the written statement of January 3rd was made, that West in that statement had answered "Yes," in response to the following written question: "At the time you took Ossen to Nowitzky's car, did you know that police officers had been concealed near there for the purpose of arrest if the circumstances warranted?"

After the Commonwealth had been allowed to make use of the written statement for the foregoing purpose, counsel for the defendant moved that they be allowed to inspect the whole of the statement and to introduce it in evidence for the purpose of further impeaching West, vouching the fact that the statement would further show that the defendant was entrapped according to admissions therein made by West, and also because the Commonwealth had been permitted to prove a part of what West had therein said but not the whole of what he said.

West was a key witness for the Commonwealth. If he had made to the officers a statement different from his testimony about the planning of the bribery, it is obvious that both statements could not be correct. One of the two must have been incorrect.

West testified that there was not a planned entrapment. He thereby admitted his participation in an attempt to commit bribery. In view of the fact that he was never placed under arrest or charged with the crime, and the peculiar circumstances surrounding the whole case, the production of the whole written statement of West for inspection by counsel for the defendant, and as evidence in the impeachment of its author should have been allowed. It was proper to acquaint the jury with the capacity of West to err. Wigmore on Evidence, 3rd Ed., Vol. III, section

1017, *et seq.;* 156 A. L. R., Annotation on Inspection of Contradictory Statement, page 345, *et seq.*

In *Falden* v. *Commonwealth,* 167 Va. 549, 189 S. E. 329, quoting from *Sorrells* v. *United States,* 287 U. S. 435, 53 S. Ct. 210, 217, 77 L. Ed. 413, 86 A. L. R. 249, we approved the following definition of entrapment:

"Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer."

We then said: "In the numerous cases we have examined which deal with entrapment the line of cleavage seems to be whether the inducement or incitement on the part of the officer has been active or passive. If active then for reasons stated the prosecution fails. In our opinion the proper rule is found in 18 A. L. R. 146. \* \* \*.

"If there be conflict in the evidence as to whether the criminal intent originated in the mind of the accused or was induced or incited by the officer, then the solution of the question should be submitted to the jury."

See also, *Guthrie* v. *Commonwealth,* 171 Va. 461, 466, 198 S. E. 481, 119 A. L. R. 683.

It is a general rule that where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of a crime which he had otherwise no intention of committing in order to prosecute him therefor, no conviction may be had, though the committing of the act is not affected by any question of consent. 66 A. L. R. 478, 508, 86 A. L. R. 263, 274; 15 Am. Jur., Criminal Law, section 336, page 25; 22 C. J. S., Criminal Law, section 45, page 99.

In view of our conclusion to reverse the judgment and order a new trial, it would be improper to undertake to discuss the weight and quality of the evidence, or by reference to place emphasis upon any particular portion of it. It is sufficient to say that the conflicting facts and circumstances, and the peculiar relations existing between two of the key witnesses of the Commonwealth present sufficient

evidence upon which the question of entrapment should have been submitted to the jury under proper instructions.

It is unnecessary, we think, to lengthen this opinion by a discussion of the secondary questions involved.

For the reasons stated, the judgment of the trial court is reversed and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*