17313

THE STATE, Respondent, v. R. J. ALLEN, Appellant

(98 S. E. (2d) 826)

392

*Messrs. Arnold R. Merchant,* of Spartanburg, *C. T. Graydon,* of Columbia, and *John D. Long,* of Union, *for Appellant,*

*Messrs. J. Allen Lambright, Solicitor,* of Spartanburg, and *J. R. Flynn,* of Union, *for Respondent.*

June 20, 1957.

TAYLOR, Justice.

Appellant, charged with the murder of his wife, was convicted of the crime of manslaughter at the May, 1956, Term of General Sessions Court for Union County and sentenced to serve three years imprisonment.

At approximately 7:45 A. M., on December 14, 1949, appellant, while in his home in Union, South Carolina, shot and killed his wife, Mrs. Lilly Mae Allen, to whom he had been married approximately ten years. Thereafter, on January 6, 1950, appellant was ordered examined by the au-

thorities of the South Carolina State Hospital, which is the institution for those mentally ill. Having completed its examination, the staff reported to the Court, on February 9, 1950, that the defendant was then insane. He was committed to the South Carolina State Hospital as an inmate on February 27, 1950. The Order of commitment provided among other things that appellant, upon his discharge from the State Hospital, would be released to the Sheriff of Union County.

Appellant remained at the Hospital as an inmate for more than five years, during which he several times requested his release. In March, 1955, a writ was issued by the Court and a hearing held at which time two members of the staff of the State Hospital testified that he was then sane. On March 22, 1955, the hearing Judge issued an Order releasing appellant to the Sheriff of Union County. On May 22, 1956, appellant was arraigned in the Court of General Sessions for Union County and plead "not guilty" to the charge of murder. Upon trial, he was found guilty by the jury of the crime of manslaughter; and appellant contends, first, that the uncontradicted testimony shows that the defendant was insane as a matter of law at the time of the shooting and, therefore, entitled to a verdict of acquittal.

Mrs. James Kennemore testified that she is an adopted daughter and that she came to visit her parents at the invitation of her mother; that at approximately 7:45 on the morning in question, she was awakened by the rustling of some papers. Shortly thereafter, she heard her mother say, "No, R. J., no," and a scream; then a shot was heard, and she rushed to the dining room where she saw her mother lying on the floor with her father pointing a pistol at her. She endeavored to divert his aim, but despite her efforts, he succeeded in firing two more shots into her body at which time she stated, "I'm done for. You are crazy. I'm done for." When she asked appellant why he did it, he stated, "She was stealing my money" and handed her a paper bag containing money with instructions to place it in the bank.

She further testified that appellant and the deceased appeared to be a devoted couple; that appellant prior to that time had given his wife gifts and deeded some property to her. She further testified that on Monday before the slaying on Wednesday, appellant and the deceased returned from town together and deceased was crying; that she heard appellant say that "if she would deed it back to him so he could deed it to me that it would be all right." To which the deceased replied, "R. J. leave it like it is, and I will pay the city and county taxes on it and keep it up. If I have to turn it back over to you, I won't."

Appellant called to the stand as a witness Dr. Harold P. Hope, of Union, who testified that he was the family physician and had known appellant for ten years; that in his opinion appellant was "mentally confused" and not able to distinguish right and wrong on December 9, five days before the slaying, and should have been sent to a mental institution as he was suffering from senile arteriosclerosis which would keep him from adhering to the right and his condition was getting progressively worse; but he refused to say that on the day of the slaying appellant was unable to tell right from wrong, a portion of his testimony being:

"Q. Well, can you tell me how sane a person would have to be to know right from wrong? A. I am afraid that is a technical point."

Dr. E. W. Long, a member of the staff of the South Carolina State Hospital, testified that appellant was committed to the South Carolina State Hospital, February 27, 1950, and released March 24, 1955; that he "felt he (appellant) definitely had a mental illness." A portion of his testimony being:

"Q. Dr. Long, at the time you examined this man, was he in mental condition to know the difference between right and wrong? A. That is a relative question. It was our opinion at that time that his mental faculties were such that he was not able to stay outside and contend with the forces out-

side; that he needed protection; that his reasoning and judgment was depreciated at that time; and to that extent I think his knowledge of right and wrong was also involved.

"Q. So then at the time you examined him it was your opinion that his knowledge of right and wrong was involved at the time, or his mental condition? A. It was deteriorated, yes, sir. His present condition.

\* \* \*

"Q. Doctor, during the whole time he was there, is it your opinion he did not know right from wrong? A. It was my opinion that he was mentally ill, and that his reason and judgment was impaired accordingly, and that I did not think he was mentally capable of going outside and competing in every day life without a serious consequence of some kind.

"Q. And then from his condition you determined him insane, is that right? A. Yes, I think he was insane."

Dr. Long further testified that he first examined appellant on January 26, 1950, more than one month after the slaying and found him suffering from psycho cerebral arteriosclerosis but refused to give any opinion "as to Appellant's condition on December 14."

Upon being committed to the State Hospital, appellant was not confined to quarters or an enclosure of any kind but permitted the freedom of the grounds with instructions not to leave the grounds.

Dr. G. B. Carrigan, another member of the staff of the South Carolina State Hospital, testified that appellant was suffering from cerebral arteriosclerosis, with psychosis, when he examined him in February, 1950; and, in his opinion, the disease had existed for at least several months and that he would suffer from short periods of confusion when he did not know right from wrong. A pertinent portion of his testimony appears as follows:

"Q. And would you say that a man was acting normally, Doctor, if after he stood there and shot his wife three times, he had sense enough to go get his bag of money and give it

to his daughter, and say, 'Put this in the bank tomorrow', would you say that was an action of a crazy man? Who didn't know right from wrong? A. You couldn't take one incident and say it was an act of a crazy man, not one thing. The answer would be no.

"Q. Well, Doctor, that doesn't sound like a crazy man, does it? A. It doesn't sound like it.

\* \* \*

"Q. But you are not attempting to say that on the 14th day of December, he did not know right from wrong? A. I am not trying to say it.

"Q. If he knew all of these things wouldn't he have known right from wrong, on December 14th? A. He may know right from wrong part of the day, and part of the day he can be confused and not know right from wrong.

\* \* \*

"Q. Doctor, could there be any better evidence of insanity, than a man killing something he loved? A. That is an element of insanity.

"Q. Could you think of anything better than that? A. No."

The appellant concluded his case with the testimony of Dr. Carrigan and Mrs. Kennemore was then recalled to the stand by the State, who, over objection of appellant's counsel, was permitted to testify in part as follows:

"Q. How did his conduct during the days that you were there, from Saturday to Wednesday, compare with his conduct as you had known him through the years? A. It seemed normal to me, except that one instance that I explained yesterday.

"Q. Well, we won't go into that. But it seemed normal to you? A. Yes, sir."

She further testified that on the night of the slaying, she visited appellant while in jail at Union, and again later and he appeared calm and no different from what he had been during the years she had known him.

Mr. A. G. Kennedy, Probate Judge for Union County, was permitted to testify over the objection of appellant's counsel that he had known appellant more than thirty years and had had business dealings with him from one to three days prior to the slaying and that he appeared normal.

From the testimony heretofore related, it is evident that appellant was suffering from some mental disability, as a result of a mental disease, when he was examined by the physicians at the State Hospital and that at one time he was declared insane. These witnesses seem to be in agreement that for short periods appellant would be insane, but there is no testimony other than circumstantial that he was insane on the day of the slaying. While at the same time, there is testimony, although not medical, that his behavior on the day of the slaying, other than the slaying itself, was not abnormal; that he and the deceased had engaged in a controversy with respect to the title to some property; that he instructed his daughter to place the money which he had given her in a bank, which was done along with other funds which were found about the house in such places as in a trunk, under a trunk, and under a rug. Upon learning that the money had been placed in a certain bank, appellant instructed his daughter to withdraw it and place it in another bank and a short time before the slaying, had attended to business as usual.

The test in this State is the mental capacity or the want of it sufficient to distinguish moral or legal right from moral or legal wrong, and to recognize the particular act charged as morally or legally wrong, *State v. Jackson,* 87 S. C. 407, 69 S. E. 883; *State v. Gilstrap,* 205 S. C. 412, 32 S. E. (2d) 163; *State v. Gardner,* 219 S. C. 97, 64 S. E. (2d) 130; *State v. Keller,* 224 S. C. 257, 78 S. E. (2d) 373; *State v. Fuller,* 229 S. C. 439, 93 S. E. (2d) 463, 466. While the foregoing evidence is quite persuasive, the question of appellant's sanity thereunder is a question of fact to be determined by the jury; and it cannot

be said that appellant at the time of the slaying was insane as a matter of law.

Appellant next urges that the "McNaghten" or the "right and wrong" rule be abandoned in favor of the "irresistible impulse" rule and requested that the jury be so charged. In the recent case of *State v. Fuller*, *supra*, this Court, quoting *State v. Gilstrap*, stated:

"After mature consideration, we firmly adhere to the rule so forcibly expressed in *State v. Levelle* [34 S. C. 120, 13 S. E. 319], *supra;* and we may add that the doctrine that a criminal act may be excused or mitigated because prompted by an irresistible impulse, where the offender has the mental capacity to appreciate his legal and moral duty in respect to it, has no place in the law."

This question must therefore be resolved against appellant's contention.

Appellant next contends that it was error to exclude proffered testimony that Dr. Hope on the day of the slaying, upon being advised of the happening at the Allen home, told the ambulance driver not to go to the Allen home without protection because "Mr. Allen is not responsible."

An examination of Dr. Hope's testimony reveals that he had examined Mr. Allen on December 9, five days prior to the slaying and gave his opinion as to his condition as of that date but refused to make a positive statement that appellant was insane on the day of the slaying. We therefore see no merit in this contention.

Appellant next contends that the trial Court erred in permitting Mrs. Kennemore and Judge A. G. Kennedy, Probate Judge for Union County, to testify in reply contending that such testimony as they gave could not be considered as being in reply to any testimony presented in chief by the State. Appellant's defense was that of insanity and his witnesses consisted of the family physician and two medical experts who examined and treated appel-

lant while in the State hospital. All of these agreed essentially that appellant was not normal at the time they examined him; that he was suffering from a mental disease; that at times they would consider him insane for short durations; that the type of disease from which he suffered would normally become worse but at the time of trial had improved; they refused, however, to testify that upon the day of the slaying he was insane. Mrs. Kennemore testified that other than the act of slaying, appellant appeared essentially normal at the time; and Judge Kennedy, who had known him for more than thirty years, considered him normal when he and appellant transacted some business a short while before the fateful day. We see no merit in this contention.

It is next contended that reversible error was committed by one of the prosecuting attorneys in commenting upon appellant's failure to testify in his own behalf in contravention of Article I, Section 17, of the Constitution of South Carolina, which provides that no person "shall be compelled in any criminal case to be a witness against himself" and Amendment V of the Constitution of the United States.

The record reveals that the following transpired:

"(Mr. Flynn then began his argument to the jury.)

"Mr. Graydon: Counsel referred to the witness, Mr. Allen, that he had not taken the stand. That is highly improper. We ask the Court at this time to declare a mistrial.

"The Court: Mr. Flynn, you said what?

"Mr. Flynn: I said, as well as I can quote myself, that we cannot—it cannot be held against the defendant that he did not take the stand in his own defense. And I think that is the law. And I think Your Honor will charge it.

"Mr. Graydon: As we understand it, Judge, he has no right to refer to it at all. The judge has the right, but not him. You can't do indirectly what the law says you can't do by direction.

"The Court: Well, let Mr. Graydon's motion for a mistrial appear in the record. I will overrule the same. I don't

think the statement made by counsel would entitle you to it. I am well aware of the rule, but I will protect your entire record. Go ahead Mr. Flynn."

It is, of course, desirable that counsel refrain from mentioning in any manner the fact that appellant did not testify; however, in the instant case, we fail to see where appellant was prejudiced in anywise as the statement made by counsel was a correct one under the law and in accordance with that later charged by the trial Judge. No prejudice having resulted, this exception must be dismissed, *State v. Howard,* 35 S. C. 197, 14 S. E. 481; *State v. Pendarvis,* 88 S. C. 548, 71 S. E. 45; *State v. Cox,* 221 S. C. 1, 68 S. E. (2d) 624.

Appellant next contends that error was committed in ██ charging the elements of manslaughter in that the verdict of manslaughter was contrary to the law and evidence. After the prosecution and defense had closed and in the absence of the jury, the following transpired between the Judge and counsel:

"The Court: * * * My basic reaction is there would be a possibility of four verdicts. If you contend otherwise, I would be glad to hear you. First, Guilty. Second, Guilty, with recommendation to mercy. Third, not guilty by reason of insanity. Or fourth, just not guilty. What say the State?

"Mr. Lambright: Your Honor, the State takes this position, and it's about the only position I feel that the State can take. Of course, as Your Honor stated, the question of whether this man was sane at the time he killed this woman or not is a question for the jury. We have always taken that position. And the State takes the position that if this man was not insane, it was cold-blooded murder. There is no extenuating circumstances other than the question whether the jury might find him insane or not. So the State would respectfully ask a charge on murder, recommendation to mercy, manlsaughter, and of course then, not guilty.

"The Court: Where is your manslaughter?

"Mr. Lambright: Well, the jury might take the position—the young lady said he was mad and was fussing about this time. * * * I say that it might. I don't know.

"The Court: Where would be your legal provocation?

"Mr. Lambright: Of course, we don't think there is any legal provocation for any of it.

"The Court: Where is the evidence of the legal provocation?

"Mr. Lambright: There are circumstances—we don't know the entire relevancy of this transaction they were fussing about * * *

"The Court: I just wanted to get your reaction. What say the defense?

"Mr. Graydon: Judge, we think that is a matter for the Court to determine from the evidence that is before the Court. We have no particular suggestion on that. We think the record is clear on the matter. He is not guilty by reason of insanity. We think the record is clear on that. But I think the Court would have to determine of its motion whether or not the evidence is in the case.

"The Court: All right, sir. Then I ask you, do you request me to charge the law of manslaughter?

"Mr. Graydon: No, sir.

"The Court: Do you request me not to charge it?

"Mr. Graydon: No, sir.

"The Court: Mr. Graydon, you say you don't request me to charge it, and you don't request me not to charge it. I ask you, do you object to my charging manslaughter?

"Mr. Graydon: Judge, we think our position, our best position, is just to say that that is a matter for the Court to determine, the answer to it.

"The Court: All right. Then you prefer not to answer it then?

"Mr. Graydon: Don't get me that way now.

"The Court: I think you are entitled to take your position in it.

"Mr. Graydon: I understand Your Honor is trying to be fair with me, is honestly trying to be overly fair to the defense, but I can't say what I want to say, Judge.

"The Court: If you prefer not to indicate an answer to it, just so state and I will not pursue it any further.

"Mr. Graydon: I can't honestly and truthfully, in the interest of my client, give the answer that I want to give to you. I am sorry. I just can't do it.

"The Court: All right. Let your record show that on the basis of the positions taken by the State and by the defense, that I will charge the law of voluntary manlsaughter. I will not charge the law of involuntary manslaughter. Counsel in argument to the jury may keep this in mind as they present the case."

There was evidence that the deceased and appellant had shortly before had some disagreement with respect to some real estate; that on the morning of the slaying the daughter was awakened by the rustling of papers and angry words, and the jury may have concluded that appellant at the time was not insane but killed the deceased in sudden heat and passion. Appellant at the time of trial did not request the Court to exclude voluntary manslaughter from the charge although given an opportunity to do so. Having failed therein, he cannot now complain. Code 1952, Section 10-1210; *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769; *State v. Anderson,* 229 S. C. 403, 93 S. E. (2d) 210

We are of the opinion that all exceptions should be dismissed and the judgment of the Court affirmed, and it is so ordered.

Affirmed.

OXNER, LEGGE and Moss, JJ., concur.

G. DUNCAN BELLINGER, Acting Associate Justice, concurs in result.

G. DUNCAN BELLINGER, Acting Associate Justice (concurring in result).

I concur in the result reached in this case, reserving my opinion upon whether the McNaghten rule of "right and wrong" is the proper test of insanity. The McNaghten test of insanity that has been adopted by our Courts was argued at length and criticized by the counsel for appellant, but he stated very frankly, "It is not our purpose to say that the court should change a time-tested rule merely because of changes in psychological criterion or psychiatric concepts * * *." The appellant had not sought or obtained permission from this court to argue against any of the cases of this State holding to the "right and wrong" rule and did not seek to have those cases adhering to that rule be reversed. I, therefore, reserve my opinion upon this question until and unless I am called upon to pass on it when it has been properly raised.

My present impression is that our test of insanity adhering to the principles of the McNaghten test is not the proper test, especially when we repudiate the element of irresistible impulse regardless of the nature or the type of the insanity in view of the great advance that psychiatry has made since the pronouncement of the rule or test in that case.