17777

STATE, Respondent, v. Thomas D. JACOBS, William T. Hill and Jobie Shelton, of whom Jobie Shelton is, Appellant

(119 S. E. (2d) 735)

*Marshall W. Abercrombie, Esq.,* of Laurens, *for Appellant, Jobie Shelton,*

*W. T. Jones, Esq., Solicitor,* of Greenwood, *for Respondent.*

May 8, 1961.

Moss, Justice.

Thomas D. Jacobs, William T. Hill and Jobie Shelton were indicted by the Grand Jury of Laurens County, South Carolina, and charged with willfully and unlawfully entering into an agreement, confederation and conspiracy to seize, confine, inveigle, decoy, kidnap, abduct and carry away Robert M. Vance, Jr., and to hold him for ransom and reward, and did do overt acts towards carrying out such unlawful agreement, confederation and conspiracy. The indictment also alleged that none of the defendants were a parent of the said Robert M. Vance, Jr. All of the defendants were arraigned at the 1957 term of the Court of General Sessions for said Laurens County. Each of the defendants entered a plea of not guilty. They were tried and found guilty as charged and the jury recommended mercy. All of the defendants were sentenced to life imprisonment. This Court is advised that Thomas D. Jacobs and William T. Hill have died since conviction and sentence. Therefore, Jobie Shelton is the only appellant. At appropriate stages of the trial, the appellant made a motion for a directed verdict upon grounds that will be hereinafter discussed. After the rendition of the verdict of guilty, the appellant made a motion for a new trial. All of these motions were refused.

Section 16-91 of the 1952 Code of Laws of South Carolina, provides:

"Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means

whatsoever and hold such person for ransom or reward, except when a minor is seized or taken by a parent thereof, shall be guilty of a felony and, upon conviction, shall suffer the punishment of death; *provided, however,* that when any such person is found guilty of such felony the jury may find a special verdict recommending him or her to the mercy of the court, whereupon the punishment shall be reduced to imprisonment in the penitentiary with hard labor during the whole lifetime of the convicted person; *provided, further,* that notwithstanding the foregoing provisions of this section with respect to the punishment of death, if the kidnapped person be released and returned alive prior to the opening of the trial, the death penalty shall not be imposed and the convicted person shall be punished by imprisonment in the same manner as though the jury had recommended him to the mercy of the court."

Section 16-92 of the Code provides:

"If two or more persons enter into an agreement, confederation or conspiracy to violate the provisions of § 16-91 and any of such persons do any overt act towards carrying out such unlawful agreement, confederation or conspiracy each such person shall be guilty of a felony and, upon conviction, shall be punished in like manner as provided for the violation of § 16-91."

Section 16-550 of the 1959 cumulative supplement to the 1952 Code of Laws, defines a conspiracy as follows:

"The crime known to the common law as conspiracy is hereby defined as a combination between two or more persons for the purpose of accomplishing a criminal or unlawful object or an object neither criminal nor unlawful by criminal or unlawful means."

The foregoing statute defining conspiracy confirms a definition thereof as is contained in *State v. Ameker,* 73 S. C. 330, 53 S. E. 484; *State v. Davis,* 88 S. C. 229, 70 S. E. 811, 34 L. R. A., N. S., 295; and *State v. Hightower,* 221 S. C. 91, 69 S. E. (2d) 363, 369. In the last cited case, this Court said:

"The generally recognized rule is that the fact of a conspiracy may be proved by any relevant competent evidence, having a legitimate tendency to support the accusation. The conspiracy may be shown, of course, not only by direct evidence, but by circumstantial evidence, or by both. And in a case of this kind, in the reception of circumstantial evidence, great latitude must be allowed. *State v. Shipman,* 202 N. C. 518, 163 S. E. 657; 15 C. J. S., Conspiracy, § 92b, p. 1141. Here, we have not only circumstantial evidence, but direct evidence going to prove appellant's guilt.

"Conspiracies may and generally must be proved by a number of indefinite circumstances which vary according to the objects to be accomplished. Any circumstance or act standing alone might have little weight, but, taken collectively, they point unerringly to the existence of the conspiracy. *Bloomer v. State,* 48 Md. 521. And as stated by the Court in *State v. Anderson,* 208 N. C. 771, 182 S. E. 643, 652: 'When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose.' And see Annotation, Vol. 3 Am. St. Rep., Page 482."

In *State v. Quick,* 199 S. C. 256, 19 S. E. (2d) 101, 102, the general rule was stated that the law does not concern itself with mere guilty intention unconnected with any overt act; that no definite rule as to what constitutes an overt act can safely be shown, each case being dependent on its own particular facts. The Court further said: "It is well settled that the 'act' is to be liberally construed, and in numerous cases it is said to be sufficient that the act go far enough toward accomplishment of the crime to amount to the commencement of its consummation."

The appellant asserts that the evidence in this case is insufficient to sustain his conviction of conspiracy to kidnap. He asserts that the trial Judge should have directed a verdict

of not guilty and, failing in that, should have granted his motion for a new trial.

The evidence is susceptible to the conclusion that Thomas D. Jacobs came to the home of one Lewis A. Young at about 11:30 p. m. on February 14, 1957, and proposed to the said Lewis A. Young the making of some easy money by kidnapping a boy four or five years old. It appears that Jacobs stayed in the home of Young until some time on the afternoon of February 15, 1957. After Jacobs left, Young had one Watts Davis, a groceryman living in the community, to telephone the sheriff of Laurens County. Thereafter, Young was contacted by the sheriff and the chief of police of the town of Clinton. They were told of the statement made by Jacobs to Young. After this incident, Young was talked to by many law enforcement officers and he was advised to keep the officers notified of any developments towards the carrying into effect of the intention stated by Jacobs to kidnap a young boy. Jacobs again contacted Young on March 4, 1957 and talked with him concerning the kidnapping, but did not reveal the name of the intended victim. Young saw Jacobs the next day at his office in Clinton, at which time Jacobs said they could kidnap the child and get One Hundred Thousand ($100,000.00) Dollars as ransom. Young told Jacobs he didn't believe he could get by with his intended plan. This witness testified that he went with Jacobs to the place where he intended to take the child after kidnapping him, and there hold him until the ransom money was paid. This place was in the Musgrove Mill section of Spartanburg County, down near the river. Young testified that Jacobs walked with him down near the river and said, "Here's where you can bring the boy after the kidnap." Young saw Jacobs again on March 12, 1957, and there was further conversation with reference to the kidnapping. Young again saw Jacobs on March 14, 1957, but the kidnapping was not mentioned. The last meeting between these parties was on June 5, 1957, at the home of Young. The kidnapping was again discussed and Jacobs told Young that he

had gotten some negroes to help with the kidnapping, and they were Will Hill and one named "Jobie". He was told that he had printed a ransom note with his left hand on brown paper. It was at this meeting that Jacobs named Robert Vance, Jr. as the intended victim. Young positively testified that he never told Jacobs that he would assist him with the kidnapping. This witness again saw Jacobs at his office on Saturday, June 8, 1957. On this day Young accompanied Jacobs to the home of Jobie Shelton, the appellant herein, but Shelton was not at home. When Young and Jacobs left the home of Shelton, they went to the home of William T. Hill, and Jacobs conversed with Hill away from the automobile in which the parties were traveling, but the witness did hear Jacobs tell Hill that Young and Jobie Shelton were going to do the kidnapping. When Jacobs and Young returned to the town of Clinton, they rode down by the home of Robert M. Vance, Sr. and Jacobs pointed out with reference to the habits of the intended victim of the kidnapping, that "Here is where the nurse generally comes out with the little boy", and the spot was pointed out as to where the child was to be picked up. Young testified that Jacobs said Jobie would knock the negro nurse in the head and the ransom note would be placed in her bosom or under her belt. Young was supposed to grab the child while Shelton was attacking the negro maid. They were supposed to stuff gauze in the child's mouth and put tape over his mouth so he could not "holler". The tape and gause for this purpose were furnished by Jacobs. The child was to be kidnapped on June 10, 1957, between 1:00 and 3:00 o'clock p. m. and he was to be taken to a place near that previously pointed out to Young by Jacobs. Young testified that Jacobs told him that Jobie Shelton had been out to the place where the child was to be taken. On the morning of June 10, 1957, Jacobs and Young went to the home of Jobie Shelton. This was the first time that Young had seen the appellant with reference to the kidnapping. He testified that Jacobs talked to Shelton and "He said, 'Jobie', said 'you know Mr. Young

here?' He said yes, sir, he knowed me. And he said, 'Y'all will pick the boy up. Go down there to Robert Vance, Jr.'s. Go down there and take your time and watch; 'cause if it's too many cars and things coming by, you cannot make a snatch, just have to wait.' That I could have my—cover my front car plate up. Didn't say nothing about the rear one, said cover the front." This witness said that Shelton's reply was "Yes, sir, all right." Jacobs took the ransom note out of his pocket and started to give the note to Shelton during the conversation at Shelton's home, but the note was finally placed in the glove compartment of the automobile. This note was wrapped in brown paper. It was agreed at Shelton's home that Young was to pick up Shelton at Adair's store in Clinton between 12:45 and 1:00 o'clock p. m. on the same day. Shelton agreed to be present at the appointed time and place. Young exhibited the ransom note to the officers between the time he was at the home of Shelton and the time he picked up Shelton at Adair's store. Young arrived at Adair's store as agreed and Jobie Shelton was there. Young testified that he asked Shelton, "Well, you ready to go?" And Shelton replied, "Yes, sir." This had reference to going to the place where they were supposed to kidnap the boy. After Shelton had joined Young at Adair's store, they rode by the home of Robert M. Vance, Sr., who was the father of the boy who was to be kidnapped. They stopped at a filling station and drank a soft drink and came back to a point near the Vance home. After staying there some four or five minutes, Young told Shelton, "There ain't no use setting here. Cause it looks like it is going to rain." It was then agreed that Young and Shelton would ride over to the Musgrove Mill section and look over the place where it was intended to take Robert M. Vance, Jr. after he had been kidnapped. While Young and Shelton were going from Adair's store to the Vance home, Shelton took the ransom note out of the glove compartment and placed it in his pocket. He used a towel for a hand covering while he was handling the ransom note. Shelton was arrested while he and Young were on

their way to the place where the kidnapped victim was to be taken. At the time of the arrest the officers found the ransom note in Shelton's pocket. The witness Young was asked this question, "You were to be the man to get the boy?" And he answered, "Me and Jobie."

The sheriff of Laurens County testified that he, along with another officer, parked in the Thornwell Orphanage grounds across the street from the Vance home at the time when the kidnapping was supposed to take place. He observed Young and Shelton passing in a car and a few minutes thereafter they came back and parked at the south edge of the Vance home. They sat there for a little while and then left.

When Shelton was arrested, he stated to officer Blakely, "I was going to tell you all about it." Thereafter, the testimony shows that Shelton made a free and voluntary confession of his part in the kidnapping plot. This confession was offered in evidence.

Young testified that he called Jacobs on the telephone after Shelton had been arrested, and told Jacobs "Things has happened. Now you can get gone." He explained that this meant that Jacobs was to carry out the other plans he had in mind about the ransom. It further appears that thereafter Robert M. Vance, Sr. prepared a box which was supposed to contain the ransom money in the amount of Three Hundred and Fifty Thousand ($350,000.00) Dollars, and he placed this box, as directed by the ransom note, at the foot of a pine tree with a white spot thereon, near the intersection of the Cross Hill-Kinards and Clinton-Chappells Road. Vance had been given a copy of the ransom note by the officers. Young had shown them the original and a copy had been made from such. The box containing the supposed ransom money was deposited by Vance at about 8:30 p. m. on June 10, 1957. Jacobs was arrested when he attempted to pick up the box containing the supposed ransom money. He had the aforesaid box in his hands when the officers arrested him.

It is not necessary to the decision of this case, but a review of the record shows that there was ample evidence to connect William T. Hill with the kidnapping plot. He, likewise, made a voluntary confession as to his participation in such.

Thomas D. Jacobs was called as a witness in his own behalf. He testified that the plan to kidnap the Vance boy originated with the witness, Lewis A. Young. He asserted, because of his financial stress, that he was entrapped into joining the kidnapping plan. He admitted writing the ransom note and doing various acts, looking towards the consummation of the plot. He asserts that he attempted to get William T. Hill, at the suggestion of Young, to help with the kidnapping plot, but Hill refused. He admits that he went with Young to the home of Jobie Shelton, but asserts that it was Young who made the arrangement with Shelton to meet him at Adair's store. In short, the testimony of Jacobs, as to his activities and those of Young and Shelton, was practically a restatement of the evidence as given by Young, except that Jacobs claimed that Young was the moving spirit in the kidnapping plan and that he was entrapped into going along because of his financial condition. Jacobs admitted that he wrote himself a note, seeking at the time, by the mispelled words and the language used, to cover up his own identity. Jacobs admitted that the note was couched in such language as to make it appear that some ignorant negro was writing it. He admitted sticking the note he prepared under his own door. Jacobs also admitted that he went to the place where the ransom money was supposed to be deposited and was arrested with the box supposed to contain the money in his hands.

We deem it unnecessary to further recite the testimony. There was ample testimony upon which the jury could have found all of the defendants guilty, as they did. There was no error on the part of the trial Judge in his refusal to grant the appellant's motion for a directed verdict. There was ample evidence to sustain the conviction of the appellant on

the charge that he had entered into a criminal conspiracy to kidnap. There was, likewise, ample evidence of many overt acts committed by Shelton in furtherance of the conspiracy.

The appellant moved for a directed verdict of not guilty on the ground that the conspiracy charged in the indictment was not a criminal conspiracy. He likewise, moved for a directed verdict on the ground that the proof was at variance with the conspiracy charged in the indictment. The indictment charges a conspiracy between Jacobs, Shelton and Hill to kidnap Robert M. Vance, Jr. An examination of the indictment shows that it charged a conspiracy to violate a criminal statute, in the words and terms of the conspiracy statute, and containing a sufficient description of the object of the conspiracy. An indictment is ordinarily sufficient if it is in the language of the statute. *State v. Blease,* 1 McMul. 472. The appellant's motion for a directed verdict of not guilty on the ground that the indictment did not charge a criminal conspiracy, was not timely made. Section 17-409 of the 1952 Code, provides: "Every objection to any indictment for any defect apparent on the face thereof, shall be taken by demurrer or on motion to quash such indictment before the jury shall be sworn and not afterwards." The appellant did not raise the objection at the proper time or in the proper way. The record shows that there was no demurrer to the indictment or motion to quash it, but that the objection was first raised by a motion for a directed verdict. The proper time to have raised such issue was prior to the swearing of the jury, objection to be taken by demurrer or motion to quash the indictment. The appellant, having failed to properly raise the issue below is precluded from doing so here. *State v. Smith,* 215 S. C. 387, 55 S. E. (2d) 343. The crime of conspiracy to kidnap was charged in the indictment and such allegation was sustained by the evidence. This ground of appeal is overruled.

The appellant also moved for a directed verdict on the ground that he was entrapped into the alleged conspiracy, which was instigated by an agent of the

Sheriff of Laurens County. Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer. *Ossen v. Commonwealth,* 187 Va. 902, 48 S. E. (2d) 204; *Sorrells v. United States,* 287 U. S. 435, 53 S. Ct. 210, 77 L. Ed. 413, 86 A. L. R. 249.

It is a general rule that where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of a crime which he had otherwise no intention of committing in order to prosecute him therefor, no conviction may be had, though the committing of the act is not affected by any question of consent. 66 A. L. R. 478, 508, 86 A. L. R. 263, 274; 15 Am. Jur., Criminal Law, section 336, page 25; 22 C. J. S., Criminal Law, section 45, page 99.

However, in the case of *Sorrells v. United States, supra,* it was stated, that "the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." [287 U. S. 435, 53 S. Ct. 212.]

In 15 Am. Jur., Criminal Law, section 335, at page 24, it is said:

"* * * It may therefore be stated as a general rule that where the doing of a particular act is a crime regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the criminal offense is completed, the fact that an opportunity is furnished or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor constitutes no defense. To the argument that the act is done at the instigation or solicitation of an agent of the government, the courts have responded that the purpose of the detective is not to solicit the commission of the offense, but to ascertain if the defendant is engaged in an unlawful business. It is no defense that a person, act-

ing as a decoy, furnished an opportunity for the commission of the offense. Such conduct is held not to procure the offense to be committed, the theory being that the offender acts of his own volition and is simply caught in his own devices. * * *"

In *Sherman v. United States,* 356 U. S. 369, 78 S. Ct. 819, 821, 2 L. Ed. (2d) 848, we find the following:

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.) See 287 U. S. at pages 441, 451, 53 S. Ct. at pages 212, 216. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in *Sorrells v. United States, supra.* On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence."

In the case of *Alford v. Commonwealth,* 240 Ky. 513, 42 S. W. (2d) 711, it appears that the defendants were convicted of attempting to rob a safe with explosives. It appeared that an associate of the defendants revealed to the police the plan to rob a certain store. He was instructed to continue his negotiations with them and to keep the police informed. On the night of the attempted robbery the associate was designated by the defendants to overpower the night watchman and allow them to enter the store. In the meantime, the police officers had hidden themselves in the store, and, when the defendants were let in by the associate and were proceeding to rob the store, they were captured. It was held that the lower Court did not err in refusing to give

an instruction on entrapment, since it appeared that the criminal intent originated in the minds of the accused.

The testimony in behalf of the State, as given by the witness Young, concerning the plan to kidnap, was as follows:

"Q. Did you ever at any time during your conversation with Jacobs, or anyone else involved as a defendant in this case, do anything to promote or to originate the idea of it? A. No, sir.

"Q. Who originated the idea of the whole thing in the beginning? A. Mr. Thomas D. Jacobs.

"Q. At your home on the night of February 14, 1957? A. Yes, sir."

Thomas D. Jacobs testified that the plan to kidnap was originated by the witness Lewis A. Young. He said, "Lewis had wanted me to go in a kidnapping proposition with him, and told me we could make some good, easy money," and "when he said that, man, that is just foreign to my nature, I wouldn't do a thing like that, and that is just foolish." Later this witness testified, referring again to Young, "In effect, he wanted me to go into this kidnapping, that plot that he was drumming up." Jacobs testified as to the many overtures made to him and the pressure put upon him by Young to go into the plan and plot to kidnap Robert M. Vance, Jr. He says he finally yielded to the entreaties of Young because of his own financial troubles and difficulties. This testimony was denied by the witness Young, who insisted throughout the giving of his evidence, that the plot and plan to kidnap originated with Jacobs.

We point out again that the appellant joined in the plan, according to the testimony of Young, at the request and insistence of Jacobs.

The learned trial Judge, in an able charge, submitted to the jury the defense of entrapment. The charge of the trial Judge was in conformity with the law as we have hereinbefore cited it. It is our view that the evidence

as to the defense of entrapment was sufficient to require the submission of this issue to the jury. There was some evidence tending to support the contention of all of the defendants that they were victims of entrapment, as that term is known to the law. The trial Judge could not determine, as a matter of law, that the defense of entrapment had been made out. Hence, it was not error to refuse to direct a verdict on the ground of entrapment.

The appellant asserts that the trial Judge committed error in his charge to the jury, as follows: (a) In charging the jury that the maximum punishment under section 16-92 is death by electrocution, and that the same was highly prejudicial to the defendants, and further, for not charging the entire section 16-92 but only a portion thereof. (b) In charging the jury on the 1957 Acts (section 16-550 of the 1959 Cumulative Supplement) defining conspiracy to kidnap as a felony when said Act expressly omits the crime of kidnapping. (c) In charging the law with reference to entrapment, in that this was highly prejudicial because it conveyed to the jury the idea that the actions taken by the officers were proper and that they were not to consider the defense of entrapment.

We have carefully examined the charge of the trial Judge and find no error therein. He charged section 16-92 of the Code in full and explained the meaning thereof to the jury. The charge defining conspiracy was in the language of section 16-550 as is contained in the 1959 Cumulative Supplement to the 1952 Code of Laws. There was certainly no error in so doing because this section defines a conspiracy and must be taken in connection with section 16-92 of the Code. Likewise, we do not find any error in the charge of the trial Judge as to the law of entrapment.

The exceptions asserting error in the charge of the trial Judge are not properly before us. It appears that after the trial Judge had delivered his charge to the jury, that he temporarily excused the jury pursuant to sec-

tion 10-1210 of the Code, 1957 Supplement, and gave opportunity to counsel for the appellant to object to the charge as made or to request additional instructions. The appellant did not avail himself of this opportunity and, thereby, waived any right that he may have had to object to the charge as made or to request additional instructions. *State v. Anderson,* 229 S. C. 403, 93 S. E. (2d) 210; *State v. Allen,* 231 S. C. 391, 98 S. E. (2d) 826; *State v. Hollman,* 232 S. C. 489, 102 S. E. (2d) 873, and *State v. Collins,* 235 S. C. 65, 110 S. E. (2d) 270.

We have, purely *ex gratia,* reviewed the entire typewritten record in this case for any error affecting the substantial rights of the appellant, even though not made a ground of appeal. We find no such error in the record.

All of the exceptions of the appellant are overruled and the judgment of the lower Court is affirmed.

TAYLOR, C. J., and OXNER, LEGGE and LEWIS, JJ., concur.