739 S.E.2d 898

**The STATE, Respondent,**

v.

**Francis LARMAND, Appellant.**

**Appellate Case No. 2009–144086.**

**No. 5097.**

Court of Appeals of South Carolina.

Heard Nov. 29, 2012.

Decided March 13, 2013.

C. Rauch Wise, of C. Rauch Wise Attorney at Law, of Greenwood, and John D. Rhea, of McKinney, Givens, Tucker & Rhea, of Rock Hill, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Deborah R.J. Shupe, all of Columbia, and Solicitor Kevin S. Brackett, of York, for Respondent.

PER CURIAM.

Francis Larmand appeals his convictions for second-degree lynching, conspiracy, and pointing and presenting a firearm. He argues the trial court erred in: (1) submitting his written charge to the jury; (2) not directing a verdict on the charges of lynching, conspiracy, and pointing and presenting a firearm; and (3) charging the jury that it may infer all persons who are present as members of a mob when an act of violence is committed are guilty as principals. We reverse.

FACTS

Ryan Lochbaum worked for Larmand's wife, Kerriann, at Pop–A–Lock from 2005 to October 2008, when he was terminated.[1] Lochbaum filed for unemployment benefits; however, Kerriann testified against him, and he was denied benefits. Kerriann became suspicious that Lochbaum was intercepting calls from her business and reaching her customers before she could respond, so she and Larmand initiated a bogus call for locksmith services ("a mystery shopper call") to try to catch him answering the call.[2] In this particular instance, Larmand drove his truck to Knight's Stadium in Fort Mill, and Leo Lemire, Kerriann's brother, went with him. Kerriann placed a call to the central Pop–A–Lock dispatch in Lafayette, Louisi-

---

1. Pop–A–Lock is part of a national locksmith franchise company that provides roadside assistance and locksmith services for automotive customers.

2. Kerriann testified a "mystery shopper call" is a technique used in the locksmith industry to detect call interception.

ana, requesting to have a key made for someone who had locked his keys in his car at the stadium. However, no one responded to the call to provide locksmith services. Larmand then decided to drive to Lochbaum's house in Rock Hill to see if Lochbaum had a Pop–A–Lock magnet on his car or if any Pop–A–Lock employees were at his house.

Lochbaum testified he was sitting in his van in his driveway when Larmand walked up to his house and asked to talk to him. Lochbaum testified that as they spoke, he saw Lemire "walking toward [him] at a good clip, carrying a very large handgun." Lemire said to Lochbaum, "This is what you get when you f**k with my family," and pulled the hammer on the gun. Lochbaum asserted he reached for the gun, and as they were struggling, Larmand grabbed him around his neck. Eventually, Lochbaum got the gun from Lemire, and Larmand and Lemire ran off. Lochbaum's knuckles and hands were cut in the struggle to get control of the gun, but he did not sustain any other injuries.

Larmand testified he did not know Lemire had a gun with him and did not conspire with him to point a firearm at Lochbaum. He testified he parked down the street from Lochbaum's house "to keep [Lemire] out of it [because] [h]e didn't need to be involved," and he told Lemire to stay in the truck. He further testified he never told Lemire about Lochbaum or that he thought Lochbaum was stealing business from Kerriann. Larmand said he told Lochbaum to leave Kerriann's company alone, and he admitted he was "agitated." He stated Lochbaum asked him why they were contesting his right to unemployment benefits. Larmand told him to "man up and get a job," and he started to walk back to his truck. As he was walking away with his back to Lochbaum, he heard Lemire yell, "Don't f**k with my family." He then saw Lemire and Lochbaum struggling with a gun. Larmand put one arm around Lochbaum to pull him off Lemire. Larmand testified Lochbaum took the gun from Lemire and said, "Get the hell out of here." Larmand testified he and Lemire then walked back to Larmand's truck and drove away.

Lemire testified Larmand did not ask him to bring the gun and did not know he had a gun with him. He stated Larmand asked him to go on a sting with him. They met at Larmand's

house, and while Larmand was inside, Lemire grabbed his belongings from his car, including his gun, and got into Larmand's daughter's truck. He put the gun under the passenger seat. He claimed they did not talk about Lochbaum the entire night. After no one responded to the mystery-shopper call, Larmand asked Lemire if he would ride to a house with him to see if any of the cars had a Pop–A–Lock magnet or if any Pop–A–Lock employees were there. When they got to Lochbaum's house, Larmand told Lemire he was going to talk to someone and for him to wait in the truck. He denied that Larmand asked him to pull a gun on Lochbaum. When he heard someone yelling, Lemire got out of the truck and grabbed his gun. He walked to Lochbaum's house because he wanted to make sure Larmand was okay. He approached Lochbaum while holding the gun in the air and told him, "Don't f**k with my family." He testified he told Lochbaum not to mess with his family because he "thought they were gonna jump [Larmand] and beat the snot out of him." Lochbaum grabbed for the gun, and Lemire fell to the ground with Lochbaum on top of him. Lemire claimed he relinquished the gun when he was told the police were coming. He admitted the gun was loaded, but denied attempting to fire it. Lochbaum took the gun and pointed it at them. Larmand and Lemire then walked back to the truck and left.

Bystanders called the police, who stopped Larmand after he left the scene. During the traffic stop, Lemire was arrested for pointing and presenting a firearm and was taken into custody. Larmand was not arrested at that time and was allowed to leave. Larmand was arrested the next day when he went to arrange bail for Lemire. Larmand was charged with second-degree lynching, conspiracy, and pointing and presenting a firearm. Lemire was charged with the same offenses.

A trial was held, and at the close of the State's case, Larmand made a motion requesting the court require the State to elect between proceeding on the conspiracy charge or the lynching charge. The court denied the motion. Larmand moved for a directed verdict on the charge of pointing and presenting a firearm, arguing the State presented no evidence he conspired with Lemire to have the gun, bring the gun, or brandish the gun. He also made a motion for a directed

verdict on the charge of lynching, arguing there was no premeditation under the circumstances of the case. The court denied the motions. At the close of the defense's case, Larmand renewed his motions for directed verdict, which the court denied again.

The jury found Larmand guilty of conspiracy, second-degree lynching, and pointing and presenting a firearm.[3] The court sentenced him to ten years imprisonment for second-degree lynching and concurrent sentences of five years for criminal conspiracy and pointing and presenting a firearm. The court denied Larmand's motion for a new trial. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). Thus, on review, the appellate court is limited to determining whether the trial court abused its discretion. *Id.* at 6, 545 S.E.2d at 829. An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. *State v. Garrett*, 350 S.C. 613, 619, 567 S.E.2d 523, 526 (Ct.App.2002). A motion for directed verdict is properly denied when there is any evidence, direct or circumstantial, that reasonably tends to prove the defendant's guilt. *State v. Brandt*, 393 S.C. 526, 542, 713 S.E.2d 591, 599 (2011). "When reviewing a denial of a directed verdict, an appellate court views the evidence and all reasonable inferences in the light most favorable to the State." *Id.* "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." *Id.*

## LAW/ANALYSIS

### I. Lynching

Larmand argues the trial court erred in not directing a verdict on the charge of lynching because the State failed to

---

3. Lemire was tried at the same time, and the jury also found him guilty of second-degree lynching, conspiracy, and pointing and presenting a firearm. Lemire filed a separate appeal.

prove a premeditated intent to commit an act of violence upon another person. We agree.

At the time of Larmand's conviction for second-degree lynching, section 16–3–220 of the South Carolina Code defined second-degree lynching as "[a]ny act of violence inflicted by a mob upon the body of another person and from which death does not result. . . ." S.C.Code Ann. § 16–3–220 (2003).[4] Section 16–3–230 defined a mob as "the assemblage of two or more persons, without color or authority of law, for the premeditated purpose and with the premeditated intent of committing an act of violence upon the person of another." S.C.Code Ann. § 16–3–230 (2003).[5] "Although '[t]he common intent to do violence' may be formed before or during the assemblage, to sustain a conviction for lynching the State must produce at least some evidence of premeditation." *State v. Smith*, 352 S.C. 133, 137, 572 S.E.2d 473, 475 (Ct.App.2002) (quoting *State v. Barksdale*, 311 S.C. 210, 214, 428 S.E.2d 498, 500 (Ct.App.1993)). "[T]he premeditated purpose and intent underlying a charge of lynching cannot be spontaneous." *Id.* at 137, 572 S.E.2d at 475.

At the close of the State's case, Larmand moved for a directed verdict on the charge of lynching, arguing there was no premeditation under the circumstances of this case. The State argued it presented the following evidence of premeditation: Larmand and Lemire drove together to Lochbaum's house; at midnight; were uninvited; parked down the street from Lochbaum's house; wore dark clothing[6]; and separately approached Lochbaum's house on foot with Lemire carrying a loaded gun pointed at Lochbaum. The court denied Larmand's motion, finding it was an issue for the jury.

Larmand testified he told Lemire to stay in the vehicle while he went to talk to Lochbaum, and he was not aware that Lemire had a gun with him at the time. He stated he was

4. This section was repealed in 2010 by 2010 Act No. 273, § 5, eff. June 2, 2010.

5. This section also was repealed by 2010 Act No. 273, § 5.

6. Larmand and Lemire were both wearing dark clothing. Larmand testified he was wearing dark clothing because he works on vehicles, and Lemire testified he usually wears all black.

walking back to his vehicle when he heard Lemire yell at Lochbaum. Lemire testified Larmand instructed him to stay in the vehicle, did not ask him to bring a gun, did not know he had a gun with him, and did not ask him to pull a gun on Lochbaum or harm him in any way. Lemire further testified he got out of the vehicle when he heard someone yelling, and he wanted to make sure Larmand was not in any danger. Additionally, none of the State's witnesses testified they saw any signs of any premeditated intent between Larmand and Lemire to harm Lochbaum.

While we note the State may demonstrate the intent element in a lynching case through testimonial evidence or circumstantial inferences, viewing the evidence and all reasonable inferences in the light most favorable to the State, we find the record devoid of any evidence, direct or circumstantial, tending to prove Larmand and Lemire acted with the premeditated purpose and intent required to sustain a conviction. *See Smith*, 352 S.C. at 138–39, 572 S.E.2d at 476 (finding the record devoid of any evidence, direct or circumstantial, tending to prove the co-defendants acted with the premeditated purpose and intent required to sustain a conviction and reversing Smith's conviction for second-degree lynching); *see also State v. Hernandez*, 382 S.C. 620, 625–26, 677 S.E.2d 603, 605–06 (2009) (determining the State failed to present any evidence such as acts, declarations, or specific conduct to support the inference that the petitioners had knowledge of the contents of the tractor-trailer; therefore, the conclusion that the petitioners had knowledge of the drugs in the tractor trailer was mere speculation, and the trial court erred in denying the motion for a directed verdict); *State v. Arnold*, 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004) (holding the trial court should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty). Therefore, we find the trial court erred in denying Larmand's motion for directed verdict as to the charge of lynching.

## II. Conspiracy

Larmand argues the trial court erred in not directing a verdict on the charge of conspiracy because the State failed to prove any facts that would reasonably support an agreement

between himself and Lemire to inflict an act of violence upon Lochbaum or point a firearm at Lochbaum. We agree.

 Section 16–17–410 of the South Carolina Code defines conspiracy as "a combination between two or more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful means." S.C.Code Ann. § 16–17–410 (2003). In *State v. Fleming*, 243 S.C. 265, 274, 133 S.E.2d 800, 805 (1963) (citations omitted), the South Carolina Supreme Court explained conspiracy:

> It need not be shown that either the object or the means agreed upon is an indictable offense in order to establish a criminal conspiracy. It is sufficient if the one or the other is unlawful. Nor need a formal or express agreement be established. A tacit, mutual understanding, resulting in the willful and intentional adoption of a common design by two or more persons is sufficient, provided the common purpose is to do an unlawful act either as a means or an end. Although the offense of conspiracy may be complete without proof of overt acts, such "acts may nevertheless be shown, since from them an inference may be drawn as to the existence and object of the conspiracy. It sometimes happens that the conspiracy can be proved in no other way." "To establish sufficiently the existence of the conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties. The circumstantial evidence and the conduct of the parties may consist of concert of action."

"Under South Carolina law, no overt acts need be shown to establish a conspiracy. The crime consists of the agreement or mutual understanding." *State v. Horne*, 324 S.C. 372, 381, 478 S.E.2d 289, 294 (Ct.App.1996). "Once a conspiracy has been established, evidence establishing beyond a reasonable doubt the connection of a defendant to the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy." *Id.* at 382, 478 S.E.2d at 294. "[T]he acts and declarations of any conspirator made during the conspiracy and in furtherance thereof are deemed to be the acts and declarations of every other conspir-

ator and are admissible against all." *Id.* (quoting *State v. Sullivan*, 277 S.C. 35, 42, 282 S.E.2d 838, 842 (1981)).

At trial, Larmand moved for a directed verdict, arguing there was no evidence he conspired in any way with Lemire to harm Lochbaum, bring the gun, or brandish the gun. The State asserted it presented evidence of conspiracy, which was the same evidence it argued met the premeditation requirement for the lynching charge. The court denied Larmand's motion, finding the acts and declarations of any conspirator in conspiracy and in furtherance thereof are deemed to be acts and declarations of every other conspirator and are admissible in full.

Larmand and Lemire both testified they did not conspire to attack Lochbaum, and the State presented no evidence of an agreement between the two. The only evidence the State presented was Larmand and Lemire arrived at the same place together. We find no evidence was presented from which the jury could infer Larmand and Lemire had a common agreement and understanding to injure Lochbaum or point a firearm at Lochbaum; therefore, the trial court erred in denying Larmand's motion for a directed verdict.

### III. Pointing and Presenting a Firearm

Larmand argues the trial court erred in not directing a verdict on the charge of pointing and presenting a firearm because the State failed to prove a conspiracy between Larmand and Lemire or present any evidence sufficient to convict Larmand of pointing and presenting a firearm. We agree.

It is undisputed that Larmand never had possession of the gun. The trial court denied Larmand's motion for directed verdict because Lemire had the gun, and the acts of a conspirator in conspiracy are deemed to be acts of every other conspirator. Because we find the trial court erred in denying Larmand's motion for a directed verdict as to the conspiracy charge, we also find the trial court erred in denying his motion for a directed verdict as to the charge of pointing and presenting a firearm.

### CONCLUSION

We find the trial court erred in not directing a verdict as to Larmand's charges of lynching, conspiracy, and pointing and

presenting a firearm. We decline to address Larmand's remaining arguments because these issues are dispositive of the appeal. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when its determination of another issue is dispositive of the appeal).

Accordingly, Larmand's convictions for second-degree lynching, conspiracy, and pointing and presenting a firearm are

**REVERSED.**

FEW, C.J., and HUFF, SHORT, WILLIAMS, THOMAS, PIEPER, KONDUROS, GEATHERS, and LOCKEMY, JJ., concur.